[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-15135
_____

D.C. Docket No. 1:15-cv-01045-LMM

DONALD MIKKO,

Plaintiff-Appellee,

versus

THE CITY OF ATLANTA, GEORGIA,

Defendant,

PAUL HOWARD,
Fulton County District Attorney in his individual capacity,
SHEILA ROSS,
Assistant Fulton County District Attorney, in her individual capacity,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(May 26, 2017)

Before ED CARNES, Chief Judge, ANDERSON, Circuit Judge, and CHAPPELL,* District Judge.

ED CARNES, Chief Judge:

When Donald Mikko was hired by the Atlanta Police Department as the director of its crime lab, he negotiated a contract that allowed him to perform forensics consulting work for private parties in his spare time.  After a Georgia district attorney learned that Mikko had written an expert report for and planned to testify in Florida on behalf of the defense in a criminal case, the district attorney contacted the Atlanta police chief to express his concerns.  The police chief fired Mikko.  Mikko sued the Georgia district attorney and one of his assistants, among others, under 42 U.S.C. § 1983, claiming that they had conspired to violate his First Amendment rights.  The district attorney and his assistant appeal from the district court's denial of their motion for judgment on the pleadings based on prosecutorial immunity and qualified immunity.

## I.  FACTS AND PROCEDURAL HISTORY

Because we are reviewing a ruling on a motion for judgment on the pleadings, we accept all of the allegations in the complaint as true and view them in the light most favorable to Mikko, the nonmoving party.  Douglas Asphalt Co. v. Qore, Inc., 541 F.3d 1269, 1273 (11th Cir. 2008).

---

* Honorable Sheri Polster Chappell, United States District Judge for the Middle District of Florida, sitting by designation.

2

From April 2012 to June 2013 Mikko served as the crime lab director for the City of Atlanta Police Department.  Through his education, work experience, and FBI training, he had expertise in firearms and toolmarks.  In addition to his work for the crime lab, he wanted to do outside consulting work as an expert.  According to Mikko, the contract he negotiated with the Atlanta Police Department when he was hired allowed him to "perform consulting work as a private citizen so long as it did not relate to criminal prosecutions within the City of Atlanta or any investigations in which the City of Atlanta Police Department was a participant."[1]

At some point before June 2013, Mikko agreed to testify on behalf of a criminal defendant in Florida.  His supervisor at the Atlanta Police Department called Mikko and told him that he had been "notified by the chain of command" that the prosecutor in the Florida case had sent a letter to Paul Howard, the District Attorney for Fulton County,[2] "seeking to prevent [Mikko] from testifying in his private capacity as an expert witness for the defense" in the Florida case.  Mikko then called the attorney representing the criminal defendant in Florida.  He explained to her that the prosecutor down there "was apparently trying to prevent [him] from testifying by interfering in his employment," and that "he did not think he would be able to testify, because of the call from [his supervisor]."  Thereafter,

---

[1] All of the quoted language in this part of the opinion is taken from Mikko's complaint.

[2] Most of Atlanta is in Fulton County; a small part of it extends into Dekalb County.

3

the "Florida court" called Mikko to see why "he could no longer come down to give the scheduled deposition," and Mikko, over the course of half an hour, discussed with the court his telephone call from his supervisor.

The Florida prosecutor had also contacted Sheila Ross, the Chief Executive Senior Assistant District Attorney for Fulton County, and sent her a copy of Mikko's expert report. Mikko met with his supervisor, who called Ross and, without Ross' knowledge, put her on speakerphone so Mikko could hear the conversation. Mikko's supervisor told Ross that "he understood [that] she had received a letter about [Mikko] testifying as a witness for the defense in a private case." Ross stated she had not, but that she had received a copy of a forensic lab report prepared by Mikko for the defense in a criminal case in Florida. She also said that she couldn't believe that Mikko "was going to testify on behalf of the defense," that she had read Mikko's report and "it bad-mouthed Florida law enforcement," and that she had given the lab report to District Attorney Howard, who had spoken to the Chief of the Atlanta Police Department, George Turner, about the report.

During that same telephone conversation with Mikko's supervisor, Ross also explained that District Attorney Howard had said it did "not look good for Atlanta police people, especially the crime lab director, to testify against the prosecution," and that he did "not want anyone from [the Atlanta Police Department] testifying

against the prosecution or against law enforcement." Ross told Mikko's supervisor that Howard "was not happy and that he had already talked to [Chief Turner]" about it. Ross also explained that she did "not know what the outcome of all this would be," but they "were already talking about what to do."

At his supervisor's request, Mikko prepared a memo justifying his outside consulting work. A day later, Mikko received an email from the deputy chief of police of Atlanta, asking to meet with him on June 12, 2013. At that meeting, the deputy chief told Mikko that Chief Turner had decided Mikko's services were "no longer needed" and Mikko was fired.

Mikko filed a lawsuit in Georgia state court against the City of Atlanta, Chief Turner, District Attorney Howard, and Senior Assistant District Attorney Ross alleging that he "was discharged from his employment because he had agreed to testify on behalf of a criminal defendant in a jury trial of a felony criminal matter." The complaint stated that the defendants' goal was to prevent him from testifying in criminal proceedings on behalf of the defendant in Florida, and that the defendants had harmed him because he intended to testify "in his private, secondary employment" on behalf of a criminal defendant. He alleged that the Florida prosecutor, Fulton County District Attorney Howard, Senior Assistant District Attorney Ross, and Chief Turner had all acted in an effort "to cause or

5

induce [Mikko] to withhold . . . his expert testimony and expert report on behalf of the defendant in a felony criminal proceeding then pending in a Florida court."

The remainder of the complaint makes it clear that at the time of the defendants' alleged actions, Mikko had not yet testified in the Florida case but he had agreed to do so.[3] And at the time he was fired, he had prepared for the defense in that Florida case an expert report (a copy of which is not contained in the record). The complaint alleges that "the testimony he was expected to give had no relationship whatsoever to his duties as Crime Lab Director or [was] otherwise related to any aspect of his employment with the Atlanta Police Department," and that his expert report "exposed actions by the Florida police and/or prosecutors which constituted or caused the mishandling of evidence, thereby exposing governmental misfeasance or malfeasance."

Based on those allegations, Mikko asserted three state law claims and one federal law claim. The federal claim is the only one at issue here. It contended that the defendants are liable under 42 U.S.C. § 1983 because they "took action to unlawfully retaliate against [Mikko] on account of his [intended] testimony as a private citizen in a jury trial of a felony criminal proceeding, to prevent him from testifying in the future in that same proceeding, and to deter him and others from

_____

[3] Mikko says in his brief to this Court that he "had testified by deposition," but his complaint, which is what counts for present purposes, does not mention any previous deposition. Instead, it refers to a future, "scheduled deposition" that Mikko did not attend because of the Georgia prosecutors' actions.

testifying in future proceedings, in violation of his rights under the First Amendment."

The defendants removed the case to federal court. District Attorney Howard and Senior Assistant District Attorney Ross moved for judgment on the pleadings on grounds of prosecutorial immunity and qualified immunity as to Mikko's federal claim, and on the ground of Georgia official immunity as to his state law claims. The district court granted their motion as to the state law claims, concluding that the prosecutors were entitled to official immunity under Georgia law. It denied their motion on the § 1983 claim, and the prosecutors appeal that part of the district court's judgment.

This is the interlocutory appeal of the district attorney and senior assistant district attorney (hereafter "the prosecutors" or "the Georgia prosecutors") from the denial of their motion for judgment on the pleadings based on prosecutorial and qualified immunity grounds. The City of Atlanta and the Chief of Police Turner are not parties in this appeal.

## II.  STANDARD OF REVIEW

We review <u>de novo</u> a district court's denial of a judgment on the pleadings. <u>Douglas Asphalt</u>, 541 F.3d at 1273. Claims of absolute immunity present questions of law that we review <u>de novo</u>. <u>Rich v. Dollar</u>, 841 F.2d 1558, 1561

7

(11th Cir. 1988). We also review <u>de novo</u> an interlocutory appeal from the denial of qualified immunity. <u>Douglas Asphalt</u>, 541 F.3d at 1273.

## III. DISCUSSION

The Supreme Court has recognized two kinds of immunity for prosecutors who are sued under § 1983: absolute immunity and qualified immunity. <u>Buckley v. Fitzsimmons</u>, 509 U.S. 259, 268–69, 113 S. Ct. 2606, 2613 (1993). The prosecutors claim that they are entitled to both types of immunity. They are half right.

## A. Absolute Immunity

Absolute prosecutorial immunity is function related. The defendant prosecutor must show that it is "justified for the function in question." <u>Id.</u> at 269, 113 S. Ct. at 2613. A prosecutor is immune from liability under § 1983 for his actions "in initiating a prosecution and in presenting the State's case," and for actions that are "intimately associated with the judicial phase of the criminal process." <u>Imbler v. Pachtman</u>, 424 U.S. 409, 430–31, 96 S. Ct. 984, 995 (1976). That includes "actions preliminary to the initiation of a prosecution and actions apart from the courtroom." <u>Buckley</u>, 509 U.S. at 272, 113 S. Ct. at 2615. Immunity extends to a prosecutor's "out-of-court effort to control the presentation of a witness' testimony," because that act is "fairly within the prosecutor's function as an advocate." <u>Id.</u> at 272–73, 113 S. Ct. at 2615 (quotation marks omitted).

8

The prosecutors are not entitled to absolute immunity for their alleged actions in this case because those actions were not taken in their role as advocates. The case in which Mikko planned to testify was not a case that these prosecutors were prosecuting or planning to prosecute, nor was it even located within their jurisdiction. As a result, their attempt to "control" or prevent Mikko's testimony — testimony of a witness who was neither their witness nor a witness against the State of Georgia — does not fall within their duties as advocates.

The prosecutors contend that the Supreme Court's decision in Van de Kamp v. Goldstein, 555 U.S. 335, 129 S. Ct. 855 (2009), establishes that they are entitled to absolute immunity. It doesn't. In that case, the plaintiff alleged that the prosecution had failed to disclose to his attorney information that would have impeached an informant's false testimony that had led to the plaintiff's erroneous conviction. Van de Kamp, 555 U.S. at 339–40, 129 S. Ct. at 859–60. He sued two "supervisory" prosecutors, alleging that the failure to disclose the information was a result of the supervisors' failure to train the subordinate prosecutors properly, to supervise them properly, and to establish a system for containing and organizing impeachment information about informants. Id. at 340, 129 S. Ct. at 859.

The Court explained in Van de Kamp that although the plaintiff's claim arose from the supervising prosecutors' performance of administrative duties, which are not ordinarily protected by absolute immunity, in that case the duties at

9

issue were "directly connected with the conduct of a trial" and "require[d] legal knowledge and the exercise of related discretion." Id. at 344, 129 S. Ct. at 862. They were also "directly connected with the prosecutor's basic trial advocacy duties." Id. at 346, 129 S. Ct. at 863. As a result, the prosecutors in that case were entitled to absolute immunity. Id. at 349, 129 S. Ct. at 864–65.

The prosecutors in this case argue that, as in Van De Kamp, their conduct involved "tasks connected with trial advocacy." Although their conduct may be connected to trial advocacy in an abstract, general sense, the connection between a prosecutor's actions and trial must be more specific than that. The Van De Kamp Court explicitly stated that, "unlike with other claims related to administrative decisions, an individual prosecutor's error in the plaintiff's specific criminal trial constitute[d] an essential element of the plaintiff's claim." Id. at 344, 129 S. Ct. at 862 (emphasis added). And it stated that "the type of 'faulty training' claim at issue here rests in necessary part upon a consequent error by an individual prosecutor in the midst of trial, namely, the plaintiff's trial." Id. at 346, 129 S. Ct. at 863 (emphases added). Van de Kamp does not hold, or even suggest, that prosecutors are entitled to absolute immunity for all of their administrative duties and decisions. Nor does it suggest that prosecutors are immune from liability when they perform tasks that are unrelated to any cases within their jurisdiction simply because those tasks happen to involve a case in another jurisdiction.

10

The prosecutors also point to Roe v. City & County of San Francisco, 109 F.3d 578 (9th Cir. 1997), and Harrington v. Almy, 977 F.2d 37 (1st. Cir. 1992), for the proposition that "witness evaluation falls squarely within a prosecutorial function." That's true as far as it goes, but it does not go as far as the prosecutors would have us take it. In both of those cases, the courts decided if prosecutors were entitled to absolute immunity for choosing whether to prosecute a particular police officer's cases. Roe, 109 F.3d at 583–84 ("[A]bsolute immunity exists against damage suits against individual prosecutors under 42 U.S.C. § 1983 for decisions not to initiate prosecutions."); Harrington, 977 F.2d at 42 ("[P]rosecutors enjoy [absolute immunity] from civil actions arising out of their charging decisions . . . ."). Unlike this case, those two cases involved prosecutors' decisions about their own witnesses in their own prosecutions in their own jurisdictions. Roe, 109 F.3d at 584 ("[T]he prosecutors allege that [the officer] is not a credible witness. They do not believe they can prosecute his cases . . . ."); Harrington, 977 F.2d at 42 ("[H]ere we face an individualized judgment regarding whether the presence of a particular policeman as investigating officer or otherwise as a witness would burden or compromise the prosecution's cases."). Those two decisions provide no support for prosecutorial immunity based on actions taken by prosecutors to prevent a witness from testifying in a case handled by a different prosecutor, from a different office, in a different jurisdiction.

11

The Supreme Court has told us that a district attorney's decision to hire or fire assistant district attorneys, although often crucial to the efficient operation of the office, is not protected by absolute immunity.  See Forrester v. White, 484 U.S. 219, 229, 108 S. Ct. 538, 545 (1988).  It would be passing strange to hold that while a prosecutor is not immune from liability for firing his own employees, he is immune for getting others to fire their employees.  That ends our discussion of absolute immunity, but it does not end this appeal.

## B.  Qualified Immunity

The prosecutors also contend that they are entitled to qualified immunity. "Qualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." Lee v. Ferraro, 284 F.3d 1188, 1193–94 (11th Cir. 2002) (quotation marks omitted).  To be entitled to qualified immunity, an official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."  Id. at 1194 (quotation marks omitted).  If he does that, the burden shifts to the plaintiff to establish "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct."  Ashcroft v. al-Kidd, 563 U.S. 731, 735, 131 S. Ct. 2074, 2080 (2011) (quotation marks omitted).

12

### 1. Discretionary Authority

A government official acts within his discretionary authority if his actions were (1) undertaken pursuant to the performance of his duties and (2) within the scope of his authority. Lenz v. Winburn, 51 F.3d 1540, 1545 (11th Cir. 1995). "In applying each prong of this test, we look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1266 (11th Cir. 2004). In other words, "a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1282 (11th Cir. 1998) (emphasis added). Where a plaintiff alleges that the defendants "engaged in a myriad of unlawful and improper conduct, only the conduct that caused [the plaintiff's] alleged constitutional injury is relevant to the discretionary authority inquiry." Id. at 1283.

Mikko argues that the prosecutors were not acting within the scope of their authority and, as a result, cannot be entitled to qualified immunity. He asserts that no source of authority entitles Georgia prosecutors "to cause the termination of another government agency's employee because [the employee's] testimony in a

13

Florida case made them angry" or "to oversee, select, investigate, or intimidate witnesses in a case pending in Florida."

Mikko's argument focuses on the wrong conduct.  His claim is that his First Amendment right to free speech has been violated.  The conduct that Mikko alleges violated that right is the Georgia prosecutors' communications with each other, with the Florida prosecutor, and with the Atlanta chief of police concerning Mikko's expert witness activities in Florida.  See Harland, 370 F.3d at 1266 (explaining that to determine whether a governmental official was acting within the scope of his job related duties, we consider his actions "at the minimum level of generality necessary to remove the constitutional taint").  The question then is whether, in discussing Mikko's expert activities with other law enforcement officials, the prosecutors' actions were "within, or reasonably related to, the outer perimeter of [their] discretionary duties."  Harbert Int'l, 157 F.3d at 1282.  The answer is that they were.

A prosecutor's most basic duty is to prosecute cases in his jurisdiction on behalf of the State.  Related to that duty, prosecutors may also communicate with other law enforcement agencies, officials, or employees about current or potential prosecutions, and about current or potential witnesses for the cases that may be prosecuted.  Mikko, as the crime lab director of the Atlanta Police Department and a leading expert on firearms, would be expected to testify to the findings he made

14

and the opinions he reached about particular crimes in the Atlanta area. He would also be expected to testify about the methodologies he used in making those findings and forming those opinions. All of that was part of his job. The job of defense counsel would be to challenge Mikko's opinions and methodologies in an attempt to weaken his credibility. And, as the prosecutors point out, for Mikko to render opinions and testify in cases in other jurisdictions increases the chances for inconsistencies that could be used by criminal defense counsel to cross-examine him when he serves as a prosecution expert in Atlanta cases.

Mikko's outside expert activities could also require the prosecutors to search his opinions and testimony in those other cases for possible flaws and inconsistencies before using him or his subordinates as witnesses for the prosecutors' own cases. What he did or said in those outside criminal cases could affect the prosecutors' ability to prosecute their own cases. His participation as an expert witness in cases outside of his jurisdiction — rendering opinions, attending depositions, and testifying — could also affect his availability as an expert witness for the Georgia prosecutors. The more time Mikko spends on expert work in cases in other jurisdictions, the less time he could spend as an expert witness in cases in his jurisdiction. [4]

---

[4] Mikko alleges that he negotiated a contract with the Atlanta Police Department about secondary employment, but that contract is not part of the record in this case. We are left with what the complaint alleges about it. The complaint alleges that Mikko's contract allowed him to

15

Outside work as an expert for the defense in a criminal case could also affect Mikko's relationship with law enforcement officers in the Atlanta Police Department. In his position as the crime lab director, Mikko would be expected to work with officers from the Atlanta Police Department in investigations and prosecutions. His willingness to serve as an expert witness on behalf of a criminal defendant critiquing the performance of law enforcement, even in a case in another jurisdiction involving other law enforcement officers, could diminish his ability to work effectively with Atlanta police officers. And that, of course, could diminish the prosecutors' ability to use him effectively as an expert witness in Atlanta cases.

For all of those reasons, the prosecutors were acting at least within "the outer perimeter of [their] discretionary duties," Harbert Int'l, 157 F.3d at 1282, in expressing their concerns about Mikko's outside work. Because they were, the burden on the qualified immunity issue shifts to Mikko.

---

"perform consulting work as a private citizen so long as it did not relate to criminal prosecutions within the City of Atlanta or any investigations in which the City of Atlanta Police Department was a participant." Accepting that fact as true and viewing it in Mikko's favor, see Douglas Asphalt, 541 F.3d at 1273, we conclude that the Atlanta Police Department did agree to permit Mikko to perform consulting work in his spare time in criminal or civil cases outside of the jurisdiction. And, if so, in firing Mikko for writing an expert report for, and agreeing to testify on behalf of, a Florida criminal defendant, the Atlanta Police Department may have breached its contract with him. Mikko did not, however, include a breach of contract claim in his complaint, nor has he claimed that any breach of contract by the police department violated his constitutional rights.

16

## 2. Clearly Established Law

To deprive the prosecutors of qualified immunity Mikko must show that their alleged actions violated a statutory or constitutional right that was clearly established at the time of their conduct.  Ashcroft, 563 U.S. at 735, 131 S. Ct. at 2080.  If at the time of the prosecutors' actions the law was not clearly established that their actions violated Mikko's First Amendment rights, we need not decide whether their actions actually did violate his rights.  See Pearson v. Callahan, 555 U.S. 223, 236, 129 S. Ct. 808, 818 (2009).

A government official's conduct violates clearly established law when, at the time of the alleged conduct, the contours of the right are sufficiently clear that every "reasonable official would have understood that what he is doing violates that right."  Ashcroft, 563 U.S. at 741, 131 S. Ct. at 2083.  "The salient question is whether the state of the law at the time of an incident provided 'fair warning' to the defendants that their alleged conduct was unconstitutional."  Salvato v. Miley, 790 F.3d 1286, 1292 (11th Cir. 2015) (quotation marks omitted) (alterations adopted).  That standard does "not require a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate."  Ashcroft, 563 U.S. at 741, 131 S. Ct. at 2083.  "[W]e look only to binding precedent — holdings of cases drawn from the United States Supreme Court, this Court, or the highest

17

court of the state where the [conduct] took place." Gilmore v. Hodges, 738 F.3d 266, 277 (11th Cir. 2013).

The question is: In June of 2013, was it clearly established law in this circuit that it violates the First Amendment for prosecutors to seek to have a government employer fire an employee because he had furnished an expert opinion to, and planned to testify as an expert witness for, the defense in a criminal case in another state?

Mikko contends that our predecessor Court's decision in Rainey answers that question. See Rainey v. Jackson State Coll., 481 F.2d 347 (5th Cir. 1973).[5] He argues that decision clearly established his First Amendment right to testify as an expert witness in a case in another state without being fired. In Rainey a non-tenured English professor at a public college claimed that the college had rescinded his employment contract in violation of the First Amendment after it learned that he, "while teaching at another institution during the previous year, had testified as an expert witness for the defense in a criminal case charging the obscenity of a film."[6] 481 F.2d at 349. In concluding that the plaintiff's testimony as an expert

---

[5] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

[6] Although the Rainey court did not say whether the plaintiff's testimony in that case was voluntary or compelled, an earlier decision in the case — in which the court addressed a jurisdictional issue — suggests that his testimony was not compelled. There, the court stated that the professor "was requested by counsel for the charged defendants [in the criminal obscenity

witness was protected under the First Amendment, the Court stated: "These facts make out what appear[s] to us to be a clear case of impermissibly freighting [the] plaintiff's contract with a deprivation of the First Amendment right to free speech." Id. at 350. It reasoned that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests — especially, his interest in freedom of speech." Id. (quoting Perry v. Sindermann, 408 U.S. 593, 597, 92 S. Ct. 2694, 2697 (1972)).

The Rainey decision is sufficiently distinguishable from this case that it did not provide the prosecutors with "fair warning" that their actions violated Mikko's First Amendment rights. For one thing, Rainey addressed the obligations that a public employer owes to its own employee. See id. at 349–50. It did not address the duties that a governmental official or entity owes to an employee of another governmental entity. In this case, the two prosecutor defendants are not Mikko's employers or his supervisors, nor did they work in the police department with him.

Not only that, but in Rainey the plaintiff had testified before he was hired by the defendant college that fired him. See id. at 349. He was terminated for pre-employment conduct. Here, Mikko submitted his expert report and planned to testify while he was serving as an employee of the Atlanta Police Department,

_____

case] to view [a] film and to give his expert opinion as to the literary and artistic merits of the film." Rainey v. Jackson State Coll., 435 F.2d 1031, 1032 (5th Cir. 1970).

19

which is the entity that fired him. We do not mean to say that Mikko's report or his intended testimony was not protected by the First Amendment, which is an issue we need not decide. What we do mean to say is that the circumstances of the Rainey case and this one are different enough that Rainey did not put the constitutional issue in this case "beyond debate." Ashcroft, 563 U.S. at 741, 131 S. Ct. at 2083.

Even if those two distinctions did not exist, we would still know that neither the 1973 Rainey decision nor any other decision clearly established at the time the prosecutors acted in June 2013 that their actions violated Mikko's First Amendment rights. We would know that because of the Supreme Court's 2014 decision in the Lane case, which arose in our circuit. See Lane v. Franks, 573 U.S. __, 134 S. Ct. 2369, 2378 (2014). In that case the Supreme Court held that a public employer did violate an employee's First Amendment rights by firing him because of his truthful sworn testimony that was compelled by subpoena and occurred outside the scope of his ordinary job responsibilities. Id. at 2378.

More importantly for present purposes, however, the Lane Court also held that at the time the plaintiff in that case was fired in 2009 the law of our circuit did not clearly establish that it was a First Amendment violation to fire him. Id. at 2376, 2381–83. The Supreme Court explained:

> The relevant question for qualified immunity purposes is this: Could [the defendant] reasonably have believed, at the time he fired

20

[the plaintiff in January 2009], that a government employer could fire an employee on account of testimony the employee gave, under oath and outside the scope of his ordinary job responsibilities? Eleventh Circuit precedent did not preclude [the defendant] from reasonably holding that belief. And no decision of this Court was sufficiently clear to cast doubt on the controlling Eleventh Circuit precedent.

Id. at 2381; see id. at 2383 ("At best, [the plaintiff] can demonstrate only a discrepancy in Eleventh Circuit precedent, which is insufficient to defeat the defense of qualified immunity.").

That means the Rainey decision, which our predecessor Court decided in 1973, did not clearly establish that it violates the First Amendment for a government employer to fire an employee on account of testimony the employee gave, under oath and outside the scope of his ordinary job responsibilities.[7] See id. at 2381. If it had, the Supreme Court would have decided the qualified immunity issue in Lane differently.

It is true that the prosecutors' conduct in this case occurred in June 2013, which was four-and-a-half years after the January 2009 conduct involved in the Supreme Court's Lane decision. But Mikko has not cited, nor have we found, any binding decision issued between January 2009 and June 2013 that clearly

---

[7] The Lane decision involved subpoenaed testimony, 134 S. Ct. at 2378, but Mikko was not subpoenaed to testify in the Florida case. Instead, he contends that he had voluntarily agreed to testify for the Florida criminal defendant as part of his consulting work. That fact does not distinguish Lane. The Lane decision did hold that a government employee had a First Amendment right to testify under subpoena, as well as holding that the law to that effect had not been clearly established in our circuit. But nothing in Lane or in our own precedent indicates that the law in June of 2013 was more clearly established about the right to testify voluntarily than it was about the right to testify under subpoena.

21

establishes that what the prosecutors did in this case violated the First Amendment. (The Lane decision itself could not do that, of course, because it was issued the year after the prosecutors' actions in this case.)

In order for the law to be clearly established to the point that qualified immunity does not apply, the unlawfulness of the defendant's actions must be apparent in light of pre-existing law. Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 2515 (2002). No pre-existing law compelled that conclusion for the prosecutors under the circumstances of this case, and the Supreme Court's Lane decision shows that the law of this circuit was not clearly established enough to do so. As a result, the prosecutors are entitled to qualified immunity.

The order of the district court denying the prosecutors' motion for judgment on the pleadings based on qualified immunity is **REVERSED**, and the case is **REMANDED** with directions that judgment be entered for them on that basis.

22