[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 17-10642
Non-Argument Calendar

————————————————

D.C. Docket No. 6:15-cv-00936-PGB-DCI

JACQUELYN JOHNSTON,

Plaintiff-Appellant,

versus

GARY S. BORDERS,
individually and in his official capacity
as Sheriff of Lake County, Florida,
JENNIFER FERGUSON,

Defendants-Appellees.

————————————————

Appeal from the United States District Court
for the Middle District of Florida

————————————————

(February 9, 2018)

Before ED CARNES, Chief Judge, WILSON, and JORDAN, Circuit Judges.

PER CURIAM:

Jacquelyn Johnston appeals the district court's grant of summary judgment in favor of Sheriff Gary Borders.  Because this is an appeal from summary judgment, we recount the evidence below in the light most favorable to Johnston, the non-movant.  See Buxton v. Plant City, 871 F.2d 1037, 1040 (11th Cir. 1989).

## I.

In August 2014, Lake County decided to transfer control of its Animal Services Shelter to the Lake County Sheriff's Office.  Johnston was hired as Director of the Sherriff's Office Animal Services Division, which runs the Shelter.

On her first day, Johnston reported to Major Wayne Longo.  Longo gave Johnston "stacks of paperwork," including a copy of Shelter policies, and told her to review those policies over the coming weeks with an eye toward reducing euthanasia rates.  Longo told Johnston to take her time learning Shelter policies and to defer questions to Jennifer Ferguson, the kennel supervisor, who was familiar with those policies.  Longo mentioned that Ferguson might be unreceptive toward Johnston because Ferguson had wanted the Director position.

About one week later, Ferguson informed Johnston that the Shelter was at capacity.  She told Johnston that two dogs were waiting outside in dangerously hot conditions and could not be admitted until space was made.  Johnston asked Ferguson whether she had reached out to rescue organizations, volunteers, and fosters for animal placement, in keeping with an informal protocol that the Shelter

2

called the "last chance warning." Ferguson said that she had, but none had space. Johnston instructed Ferguson to follow protocol and proceed as she would have prior to Johnston's arrival. Johnston told Ferguson that if euthanasia was necessary, she should document the reason why each animal was euthanized.

Ferguson ordered twenty animals to be euthanized that day. Ferguson initially chose the animals with the help of Diane Hagan, a euthanasia technician. Hagan testified that she "was under the impression we were going to pull animals that were sick, had behavior issues or had been there for a length of time." Halfway through the selection process, however, Ferguson began to choose dogs on her own. Hagan testified that Ferguson appeared angry and snatched kennel cards from cages seemingly at random, dooming those dogs to die.

Ferguson and Hagan euthanized the chosen animals with the help of Melanie Hollis, another euthanasia technician. At one point, Hollis protested euthanizing a dog named Harry. "No, you can't take that dog," Hollis exclaimed. "It's one of the volunteers' favorites, and it has $300 worth of donations towards its heartworm treatment." Ferguson replied "I don't give a shit," knelt beside Harry, and held him still while Hagan euthanized him.

Ferguson eventually left the room, leaving the remaining live animals for Hagan and Hollis. By that time, Hollis was in tears. Hagan and Hollis refused to euthanize three dogs that Ferguson had selected. Hagan testified that they

3

"couldn't bring [them]selves to euthanize a six-month old puppy," an eight-month old puppy, and another "nice dog" who was in fine health.

Public outrage ensued. The Sheriff's Office received emails, phone calls, and Facebook messages complaining about the large number of animals that were euthanized. One commentator said that "[n]o rescues were notified [and] no posts online gave a last chance warning."

The next day, Longo asked Johnston to meet with him and a human resources assistant. Longo presented to Johnston a list of the euthanized animals and explained that citizens were angry. According to Johnston, this was the first time she heard that any animals were euthanized. Johnston was fired that evening.

After Johnston's termination, Sheriff Borders directed the Sheriff's Office to release three press statements in response to the public outcry. On October 10, the same day Johnston was fired, the Sheriff's Office issued the following statement:

> On October 10, 2014 the director of the Lake County Sheriff's Office Animal Services division was terminated from her employment. Ms. Jacquelyn Johnston was hired by the Sheriff's Office as Animal Services Director . . . on October 1, 2014. On October 9th Sheriff's Office administration became aware that several animals were euthanized under now former Director Johnston's direction and outside of the Sheriff's Office policy of utilizing euthanasia as a last resort.

The next day, the Sheriff's Office released another statement, which said that some of the euthanized animals were neither sick nor injured. A few days later, on October 13, the Sheriff's Office released a third, more damning statement:

4

> Johnston was terminated after [the Sheriff's Office] learned that 147 animals were euthanized during her time as Director, including two (2) cats and eighteen (18) dogs in one day. All but six of those animals were put down for legitimate reasons . . . . Some of the animals were put down prematurely because the shelter was not yet at capacity even though Johnston gave the reason for euthanizing the animals as limited space. Johnston did not exhaust all the resources to save the animals and exercised bad judgment. Borders wants the shelter to be as close to a no-kill shelter as possible. Because the killings happened on Johnston's watch, it was her responsibility. Johnston made a bad call and euthanized some dogs that could have made good pets for people.

Media across the United States and London reported on the story and published Johnston's photograph. Johnston received several death threats, some of which targeted her daughter. Johnston claims that the press releases ruined her career.

Through counsel, Johnston sent a complaint letter to the Sheriff's Office denying statements made in the press releases. It explained that Johnston had instructed Ferguson to follow protocol, but that Ferguson "went completely rogue" by lying about the Shelter being at capacity and euthanizing more animals than necessary. The Sheriff's Office never directly responded to Johnston's letter, but it did release the letter without comment in response to a media request.

Johnston filed suit against Sheriff Borders, both individually and in his official capacity as Sheriff of Lake County, and Jennifer Ferguson. She asserted a 42 U.S.C. § 1983 claim against Sheriff Borders, alleging that he violated her procedural due process rights by publishing false and stigmatizing statements in

5

connection with her termination without giving her an opportunity to clear her name. She also alleged state law defamation claims against the defendants.

Following discovery, Sheriff Borders moved for summary judgment on Johnston's § 1983 claim. The district court found that Johnston did not seek available state court remedies before bringing suit in federal court. Citing McKinney v. Pate, 20 F.3d 1550 (11th Cir. 1994), the court noted that employees can petition Florida courts for certiorari to review employment termination cases and remedy due process violations. Because Johnston failed to pursue that remedy, the court dismissed Johnston's § 1983 claim and declined to exercise supplemental jurisdiction over her state law claims. This is Johnston's appeal. [1]

II.

We review de novo the district court's grant of summary judgment. Byars v. Coca-Cola Co., 517 F.3d 1256, 1263 (11th Cir. 2008). Summary judgment is appropriate when no genuine dispute of material fact exists and the movant is entitled to judgment as a matter of law. Buxton, 871 F.2d at 1040.

Johnston's § 1983 claim alleges a liberty interest deprivation. That claim is actionable if: (1) Sheriff Borders deprived Johnston of a liberty interest; and (2) adequate state remedies were not available to cure the deprivation. Zinermon v. Burch, 494 U.S. 113, 125–26, 110 S. Ct. 975, 983 (1990).

_____

[1] Johnston appeals only the district court's grant of summary judgment in favor of Sheriff Borders on her § 1983 claim. As a result, Ferguson is not part of this appeal.

6

A.

Due process requires public employers who publish stigmatizing information about an employee "to provide the opportunity for a post-termination name-clearing hearing" and to give "[n]otice of the right to such a hearing." Buxton, 871 F.2d at 1042–43. To establish that Sheriff Borders deprived her of a liberty interest, Johnston must prove: "(1) a false statement (2) of a stigmatizing nature (3) attending [her] discharge (4) made public (5) by [her] government employer (6) without a meaningful opportunity for employee name clearing." Id. The parties dispute whether the press releases were false and stigmatizing and whether Johnston had a meaningful opportunity to clear her name.

Construing the evidence in Johnston's favor, id. at 1040, several statements in the press releases are false and are stigmatizing. The first press release states that "several animals were euthanized under now former Director Johnston's direction and outside of the Sheriff's Office policy of utilizing euthanasia as a last resort." By contrast, Johnston and Hagan testified that Ferguson directed the animals to be euthanized and that the Sheriff's Office had no formal policy against euthanasia. The third press release states that "[s]ome of the animals were put down prematurely because the shelter was not yet at capacity even though Johnston gave the reason for euthanizing the animals as limited space." Yet Johnston and Hagan testified that Ferguson, not Johnston, "gave the reason for

7

euthanizing the animals as limited space." And there is no doubt that the press releases were stigmatizing. The third press release said "Johnston made a bad call and euthanized some dogs that could have made good pets for people." That Johnston received death threats and cannot find work illustrates the stigma that attaches to such a statement.

The record evidence also creates a genuine dispute as to whether Johnston had a meaningful opportunity to clear her name. Johnston testified that Sheriff Borders never notified her of her right to a name clearing hearing, and Sheriff Borders admitted that he did not know what a name clearing hearing was. Although Sheriff Borders argues that the Sheriff's Office gave Johnston an opportunity to clear her name by releasing her complaint letter in response to a media request, that disclosure was not a "meaningful opportunity for employee name clearing." Id. at 1042–43. Johnston had no opportunity to cross-examine adverse witnesses or rebut their claims. See Campbell v. Pierce County, 741 F.2d 1342, 1345 (11th Cir. 1984). For those reasons, Johnston introduced sufficient evidence to create a genuine dispute of material fact as to whether Sheriff Borders deprived her of a liberty interest.

## B.

The next question is whether adequate state remedies were available to cure Johnston's deprivation. Burch, 494 U.S. at 125–26, 110 S. Ct. at 983. Sheriff

8

Borders points to two potential remedies, arguing that Johnston could have sought a writ of certiorari or a writ of mandamus.

Johnston could not have sought a writ of certiorari. Florida law permits certiorari review by an appellate court of "the record of an inferior tribunal or agency in a quasi-judicial proceeding." De Groot v. Sheffield, 95 So. 2d 912, 915–16 (Fla. 1957). Because Johnston never received notice of a name-clearing hearing, much less an actual hearing, there was no record from which certiorari could be taken. Id. Sheriff Borders relies on McKinney, which held that certiorari was available and adequate to cure an employee's liberty interest deprivation. 20 F.3d at 1563. But that case is distinguishable because McKinney received notice and a hearing. Id. at 1561–62. As a result, there was a record of proceedings from which certiorari could be taken. By contrast, Johnston did not request or receive a hearing because the Sheriff's Office never notified her that she was entitled to one. In her case, there was no record for a Florida court to review.

Nor could Johnston have sought a writ of mandamus. Florida law allows a petitioner to seek mandamus relief to enforce a clear legal right when a public official had an "indisputable legal duty to perform the . . . action, and . . . no other adequate remedy [was] available." Fla. Agency for Health Care Admin. v. Zuckerman Spaeder, LLP, 221 So. 3d 1260, 1263 (Fla. 1st DCA 2017). Sheriff Borders argues that mandamus was adequate to cure Johnston's "lack of notice,"

9

but that argument suffers two fatal defects.  First, it takes too narrow a view of the deprivation at stake.  The deprivation animating Johnston's claim is not a lack of notice; it is the reputational harm she suffered without recourse.  See Buxton, 871 F.2d at 1046.  Giving notice was part of Sheriff Borders' duty to give Johnston a meaningful opportunity to clear her name, not an independent liberty interest.  See id.  As a result, an adequate remedy must do more than cure the lack of notice — it must give Johnston a chance to clear her name.

Second, that argument asks us to eliminate the notice requirement we set out in Buxton.  Id. ("Notice of the right to such a hearing is required.").  Sheriff Borders claims that despite his failure to give Johnston notice of her right to a name clearing hearing, no violation occurred because Johnston failed to compel him to give her a hearing.  But Johnston did not know she was entitled such a hearing precisely because Sheriff Borders failed to give her notice.  We will not penalize Johnston for not knowing something our Buxton decision required Sheriff Borders to tell her.  See id.[2]

The only other state remedy that might have cured the deprivation is a defamation action in state court.  Florida recognizes the tort of defamation, see Jews for Jesus, Inc. v. Rapp, 997 So. 2d 1106–14 (Fla. 2008), and has waived

---

[2] Sheriff Borders' reliance on Cotton v. Jackson, 216 F.3d 1328 (11th Cir. 2000), is misplaced.  In that case, Cotton requested and was denied a hearing after being fired for alleged sexual harassment.  Id. at 1329.  We held that Cotton could have sought mandamus to compel the university to grant his request for a hearing.  Id. at 1330.  By contrast, Johnston never requested a hearing because Sheriff Borders never notified her of her right to do so.

10

sovereign immunity for tort claims, see Florida Statutes § 768.28.  But pursuing a state court defamation suit would have been futile because Sheriff Borders enjoys absolute privilege for statements related to his official duties.  See Hauser v. Urchisin, 231 So. 2d 6, 8 (Fla. 1970) ("The public interest requires that statements made by officials of all branches of government in connection with their official duties be absolutely privileged."); Cobb's Auto Sales, Inc. v. Coleman, 353 So. 2d 922, 923 (Fla. 4th DCA 1978).  Sheriff Borders could claim absolute privilege with respect to the press releases because they explained his decision to fire a public employee.  See Hauser, 231 So. 2d at 8 ("Any public servant should expect that those having authority to discharge him will explain their reasons for such dismissal.").  As a result, a defamation suit was not an adequate remedy to cure that deprivation.

Because Johnston introduced sufficient evidence to show a genuine dispute of material fact as to whether Sheriff Borders deprived her of a liberty interest, and because no adequate state remedy was available to cure that deprivation, Johnston's § 1983 claim is actionable.

III.

Sheriff Borders argues that he is entitled to qualified immunity from Johnston's § 1983 claim.  "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not

11

violate clearly established statutory or constitutional rights of which a reasonable person would have known." Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (quotation marks omitted). As we have explained, the evidence construed in the light most favorable to Johnston shows a constitutional violation. The question is whether that violated right was "clearly established," which is the case if Sheriff Borders had "fair warning" that his alleged conduct was unconstitutional. Mikko v. City of Atlanta, 857 F.3d 1136, 1146 (11th Cir. 2017).

Several of our published decisions gave Sheriff Borders "fair warning" that his conduct was unconstitutional. We have held that government employees are entitled to a meaningful opportunity for a name clearing hearing after an employer places allegedly false and stigmatizing information in their personnel files. See Cotton, 216 F.3d at 1330; Buxton, 871 F.3d at 1038, 1045–46. Sheriff Borders did more than that — he publicly blamed Johnston for needlessly euthanizing over 100 animals in a series of press releases without giving her an opportunity to clear her name. As a result, Sheriff Borders is not entitled to qualified immunity.

**VACATED AND REMANDED.**

12