[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-13999
_____

D.C. Docket No. 2:15-cv-02274-JEO


THE ESTATE OF MARQUETTE F. CUMMINGS JR.,

Plaintiff-Appellee,

versus

CARTER DAVENPORT,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(October 2, 2018)

Before WILLIAM PRYOR, MARTIN, and BALDOCK,[*] Circuit Judges.

WILLIAM PRYOR, Circuit Judge:

This interlocutory appeal of the partial denial of Carter Davenport's motion

to dismiss the amended complaint by the estate of Marquette F. Cummings Jr.

_____
[*] Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit, sitting by designation.

requires us to decide whether Davenport, a prison warden, satisfied his threshold burden of establishing entitlement to qualified immunity. Cummings, a prisoner, was stabbed by a fellow inmate, was transported to a hospital, and died the next day. His estate filed a civil-rights complaint, *see* 42 U.S.C. § 1983, that Davenport violated the Eighth and Fourteenth Amendments to the Constitution by illegally interfering with Cummings's end-of-life medical care with deliberate indifference to his serious medical needs, *see Estelle v. Gamble*, 429 U.S. 97 (1976). Davenport invoked qualified immunity, but the district court ruled that he failed to establish that his alleged actions—which included the entry of a do-not-resuscitate order and the decision to remove Cummings from artificial life support—fell within the scope of his discretionary authority, his threshold burden for qualified immunity. Because Alabama law establishes that Davenport's discretionary authority did not extend to the alleged actions, we affirm.

## I. BACKGROUND

We divide our discussion of the background in three parts. First, we describe the facts about Cummings's death. Second, we describe the factual allegations that form the basis of the estate's claim of deliberate indifference against Davenport. Third, we relate the proceedings in the district court. Of course, for purposes of this appeal from the partial denial of a motion to dismiss, "we accept as true the facts

2

alleged in the complaint, drawing all reasonable inferences in [the] plaintiff's favor." *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016).

### A. Cummings's Death

Cummings was an inmate at the St. Clair Correctional Facility in Springville, Alabama. At about 7:40 a.m. on January 6, 2014, another inmate stabbed Cummings in the eye with a weapon commonly known as a "shank." Several other inmates helped Cummings to the prison infirmary, and, at about 8:00 a.m., he was airlifted to the University of Alabama at Birmingham Hospital. The University Hospital received him in the emergency room and transferred him to the Intensive Care Unit. Later that day, a University Hospital spokeswoman said Cummings was in "critical condition."

Angela Gaines, Cummings's mother, learned of the attack on her son that morning. She called the prison to "verify" that her son had been stabbed, but her calls were unanswered. That afternoon, Warden Davenport called her back to tell her that Cummings had indeed been stabbed and that he was being transported to a hospital. When Gaines asked Davenport for the name of the hospital, he stated he could not say but promised to call back with more information. Several hours later, he told Gaines that Cummings was at the University Hospital.

Gaines went to the University Hospital and asked to see her son, but the staff told her she would have to wait at least 90 minutes. At some point, the hospital

3

staff told Gaines that "Cummings had been stabbed in the eye and that, due to his injuries, he was only operating with 10% of normal brain functioning." But Gaines believed that Cummings was responsive to her "verbal cues," such as "blink if you can hear me."

Cummings never left the University Hospital. On January 7, 2014, Cummings was removed from life support, and he stopped breathing at 7:05 p.m. that evening.

### B. Davenport's Alleged Misdeeds

The estate alleges that the University Hospital's staff "declared Cummings a non-survivor shortly after his arrival," that his papers included an instruction from Davenport that "'no heroic measures' would be taken to save his life," and that this instruction came from Davenport. Dr. Sherry Melton, at Davenport's instruction, entered a do-not-resuscitate order for Cummings at about 9:17 p.m. "Melton relied upon the statements of Defendant Davenport, a non-family member and not a legal guardian, to place Cummings on [the order]." Gaines and other family members were at the hospital at the time.

At some point, "medical personnel informed Ms. Gaines that Warden Davenport authorized [them] to stop giving Cummings medication and to disconnect the life support machine." Gaines protested that she wanted Cummings to stay on life support because "he was still breathing and responding to verbal

4

commands." But the University Hospital staff "repeatedly conveyed that 'it was not her (Ms. Gaines'[s]) call' because the State had legal custody over Cummings and that the decision to let her son die was the Warden's decision." The estate alleges that Cummings's removal from life support was "[b]ased on this directive from Warden Davenport."

## C. The Proceedings in the District Court

After Cummings's death, his estate and Gaines filed a complaint against the Alabama Department of Corrections, the University Hospital, and several Department and University Hospital employees, including Davenport. The estate and Gaines asserted federal claims under section 1983 as well as state-law claims of wrongful death, outrage, and negligence. The defendants moved to dismiss the complaint, and the district court dismissed all claims except for one against Davenport.

The district court denied Davenport's motion to dismiss the estate's claim of deliberate indifference based on qualified immunity. Although Davenport "den[ied] that [he] violated any of [Cummings's] rights" and contended that the estate had not identified a violation of clearly established constitutional law, the district court ruled both that the complaint stated a claim of deliberate indifference to serious medical needs and that Davenport could not invoke qualified immunity

5

because he had not established that his alleged actions were within his "discretionary authority" as a state official.

After the district court issued its memorandum opinion granting the motions to dismiss in part, the estate and Gaines filed an amended complaint. Davenport moved to dismiss the amended complaint and again asserted qualified immunity, this time in less conclusory fashion. He argued that his alleged actions fell within his discretionary authority because, as a prison warden, it was his responsibility to "supervis[e] and control[] the care and custody of inmates including their medical care." He argued that the amended complaint failed to state a claim of deliberate indifference because it focused on whether "the proper person" had made medical decisions for Cummings, not on any denial of medical care. And he maintained that no authority clearly established that Davenport's actions were unconstitutional.

The district court again dismissed all claims except the estate's claim of deliberate indifference against Davenport. It reasoned that Davenport had not "cite[d] any authority suggesting that a warden's authority to make [medical] decisions . . . for inmates extends to making end-of-life decisions." And it concluded, based on Alabama law, that a warden must either have an advance directive from the patient or be a court-appointed guardian to make those decisions. The district court concluded that Davenport had not met his burden of

6

establishing that the alleged acts were within his discretionary authority, so he could not claim qualified immunity.

## II. JURISDICTION AND STANDARD OF REVIEW

Although we ordinarily have jurisdiction to review only "final decisions of the district courts," 28 U.S.C. § 1291, "a district court's order rejecting qualified immunity at the motion-to-dismiss stage of a proceeding is a 'final decision' within the meaning of [section] 1291." *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009). Under the collateral-order doctrine, "pretrial orders denying qualified immunity" are immediately appealable "because such orders conclusively determine whether the defendant is entitled to immunity from suit," the immunity "is both important and completely separate from the merits of the action," and an erroneous denial of immunity "could not be effectively reviewed on appeal from a final judgment because by that time the immunity from standing trial will have been irretrievably lost." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2019 (2014). "We review *de novo* a district court's denial of qualified immunity on a motion to dismiss. . . . In doing so, we accept as true the facts alleged in the complaint, drawing all reasonable inferences in a plaintiff's favor." *Bailey*, 843 F.3d at 480.

## III. DISCUSSION

We divide our discussion in two parts. First, we explain that Davenport is not entitled to qualified immunity because Alabama law establishes that his alleged

7

actions were not within his discretionary authority. Second, we explain that we lack jurisdiction to consider whether the amended complaint states a claim of deliberate indifference to serious medical needs.

### A. Davenport Is Not Entitled to Qualified Immunity Because His Alleged Actions Were Not Within His Discretionary Authority.

The district court ruled, and we agree, that Davenport is not entitled to qualified immunity because he failed to establish that his alleged actions were within his discretionary authority. Davenport has the initial burden of raising the defense of qualified immunity by proving that his discretionary authority extended to his alleged actions. Because Alabama law establishes that a prison warden does not have the discretionary authority to control a dying inmate's end-of-life decisions, Davenport cannot satisfy that burden and is not entitled to qualified immunity.

"[G]overnment officials performing discretionary functions[] generally are shielded from liability [or suit] for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (explaining that qualified immunity is an immunity from suit, not just liability). The "breathing room" afforded by qualified immunity is generous; within its scope, "it protects 'all but the plainly

8

incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Although qualified immunity provides government officials with a formidable shield, their entitlement to raise that shield is not automatic. We have explained that the official bears the initial burden of raising the defense of qualified immunity by proving that he was acting within his authority:

> To establish the defense of qualified immunity, the burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority. If, *and only if*, the defendant does that will the burden shift to the plaintiff to establish that the defendant violated clearly established law.

*Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998) (emphasis added) (citation omitted).

"To establish that the challenged actions were within the scope of his discretionary authority, a defendant must show that those actions were (1) undertaken pursuant to the performance of his duties, and (2) within the scope of his authority." *Id.* at 1282. In other words, "[w]e ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). "In applying each prong of this test, we look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an

9

unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Mikko v. City of Atlanta*, 857 F.3d 1136, 1144 (11th Cir. 2017) (quoting *Holloman*, 370 F.3d at 1266)). "[A] government official can prove he acted within the scope of his discretionary authority by showing 'objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority.'" *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988) (quoting *Barker v. Norman*, 651 F.2d 1107, 1121 (5th Cir. Unit A July 1981)). A "bald assertion by the defendant that the complained-of actions were . . . within the scope of his discretionary authority" is insufficient. *Barker*, 651 F.2d at 1124–25.

We look to state law to determine the scope of a state official's discretionary authority, as our decisions in *Harbert International* and *Lenz v. Winburn*, 51 F.3d 1540 (11th Cir. 1995), illustrate. In *Harbert International*, we examined Alabama law and the terms of a state contract to determine that directors of the Alabama Department of Transportation had the authority to withhold liquidated damages from a contractor. *See* 157 F.3d at 1283. And in *Lenz*, we held that a Florida guardian ad litem lacked the authority to enter a home and retrieve a child's possessions because Florida law established that the defendant's role was to be the

10

child's "legal representative, not . . . the child's caretaker or guardian." 51 F.3d at 1547 (emphasis omitted).

The district court correctly looked to Alabama law to determine whether Davenport's alleged actions were within his authority. And it correctly held that they were not. The Alabama Natural Death Act, Ala. Code § 22-8A-1 *et seq.*, compels the conclusion that the office of a prison warden grants no authority to enter a do-not-resuscitate order or to order the withdrawal of artificial life support on behalf of a dying inmate.

The Act establishes a comprehensive legislative scheme for end-of-life medical decisions, including the decisions to enter a do-not-resuscitate order, *see id.* § 22-8A-3(7), and to withdraw artificial life support, *see id.* § 22-8A-3(2), (10). Based on the legislative finding that "competent adult persons have the right to control the decisions relating to . . . the decision to have medical procedures, life-sustaining treatment, and artificially provided nutrition and hydration provided, withheld, or withdrawn," *id.* § 22-8A-2, the Act empowers any competent adult to execute a living will that directs his end-of-life care or to designate another competent adult to make decisions for him as his health-care proxy, *see id.* §§ 22-8A-4, -6.

For permanently incapacitated patients who have neither executed a living will nor designated a health-care proxy, the Act establishes a comprehensive

11

scheme that specifies who may make end-of-life decisions. *See id.* § 22-8A-11(a), (d). The highest-priority surrogate is "[a] judicially appointed guardian, provided the appointment specifically authorizes the guardian to make decisions regarding the withholding of life-sustaining treatment or artificially provided nutrition and hydration." *Id.* § 22-8A-11(d)(1). The patient's spouse, adult children, parents, adult siblings, and other adult relatives follow respectively. *See id.* § 22-8A-11(d)(2)–(6). If the patient has no known relatives, a committee of medical professionals may act as a surrogate. *See id.* § 22-8A-11(d)(7).

The Act establishes that Davenport lacked the discretionary authority to instruct the University Hospital to enter a do-not-resuscitate order for Cummings or to withdraw his artificial life support. Under the Act, only an authorized surrogate can consent to a do-not-resuscitate order, *id.* § 22-8A-3(7), or "determine whether to provide, withdraw, or withhold life-sustaining treatment or artificially provided nutrition and hydration," *id.* § 22-8A-11(a). Nothing in the Act empowered Davenport, as a prison warden, to act as the surrogate of a dying inmate. Davenport could outrank Cummings's relatives in the hierarchy of priority—or figure in the hierarchy at all—only if a court appointed him Cummings's guardian and "specifically authorize[d] [him] to make decisions regarding the withholding of life-sustaining treatment or artificially provided

12

nutrition and hydration," *id.* § 22-8A-11(d)(1). And Davenport has never suggested that he received such an appointment.

The Act is fatal to Davenport's defense of qualified immunity. Davenport argues that his alleged actions were within his discretionary authority because an inmate "is in the legal custody of the warden," *Ex parte Rogers*, 82 So. 785, 785 (Ala. Ct. App. 1919), and "[d]ecision-making related to the provision of medical care for inmates . . . [falls] soundly within [prison officials'] discretion," *Edwards v. Ala. Dep't of Corr.*, 81 F. Supp. 2d 1242, 1252 (M.D. Ala. 2000). We have no quarrel with these firmly established legal principles. But they do not "compel the conclusion," *Barker*, 651 F.2d at 1121, that an Alabama warden has the authority to enter a do-not-resuscitate order or to consent to the withdrawal of artificial life support on behalf of a dying inmate. And the Act makes clear that an Alabama warden does not in fact have that authority.

Davenport contends that the Act "ha[s] no application to the facts of this case," but he misunderstands the relevance of the Act to this appeal. He argues that the provisions of the Act had not "become operative in Cummings'[s] case" because the amended complaint does not allege that Cummings executed a living will or designated a health-care proxy or that Gaines was ever "made" a surrogate. But the Act controls this appeal not because it tells us the limits of Gaines's authority, but because it tells us the limits of Davenport's. The Act specifies, in

13

order of priority, who may make end-of-life decisions on behalf of a permanently incapacitated patient, and a prison warden is nowhere on the list. *See* Ala. Code § 22-8A-11.

It is a familiar canon that "[t]he expression of one thing implies the exclusion of others." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 10, at 107 (2012) (emphasis omitted). And the Act's list of potential surrogates includes not just "one thing," but a range of specific possibilities that include a court-appointed guardian, any member of the patient's family, and a medical committee. *See* Ala. Code § 22-8A-11(d)(1)–(7). The conclusion that "the expression of" all of these possible surrogates "implies the exclusion of others"—including a prison warden—is inescapable. *See* Scalia & Garner, *Reading Law* § 10, at 107 (emphasis omitted) (explaining that the "negative-implication canon" applies when the inclusions "can reasonably be thought to be an expression of all that shares in the grant or prohibition involved").

The principle that we "look to the general nature of the defendant's action" to determine whether an official was acting within his discretionary authority does not change our conclusion. *Mikko*, 857 F.3d at 1144 (quoting *Holloman*, 370 F.3d at 1266)). Davenport argues that he is entitled to qualified immunity because he had some general authority to make medical decisions for inmates, but this argument misunderstands our precedents. The reason we take care not to "assess

14

the defendant's act at too high a level of generality," *Holloman*, 370 F.3d at 1266, is not to give officials additional slack; it is to avoid the "tautology" of asking whether a defendant had the authority to violate the law, *Harbert Int'l*, 157 F.3d at 1282. What we strip away from the defendant's allegedly unconstitutional action to isolate its "general nature" is nothing more than its alleged unconstitutionality: "that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Holloman*, 370 F.3d at 1266; *see also id.* ("[W]e consider a government official's actions at the minimum level of generality necessary to remove the constitutional taint.").

If Davenport categorically lacked the authority to enter a do-not-resuscitate order or to withdraw Cummings's life support, we cannot hold that he is entitled to qualified immunity simply because he had some authority to make *other* medical decisions. That shift in the level of generality would be more generous to Davenport than is "necessary to remove the constitutional taint," *id.* If Alabama *did* empower prison wardens to make end-of-life decisions for permanently incapacitated inmates, then we would have to decide whether Davenport's exercise of that authority violated clearly established constitutional law. But the Act makes clear that Alabama has not given prison wardens that authority, and our recognition

15

that Davenport's alleged actions were outside his discretionary authority says nothing about the merits of the estate's constitutional claim.

Finally, contrary to our precedents, Davenport suggests that the discretionary-authority requirement is not part of the qualified-immunity analysis. He asserts that "[w]hile the requirement . . . is ubiquitous in Eleventh Circuit authority, interestingly, such a requirement is nowhere to be found in Supreme Court qualified immunity cases." True, the Supreme Court has never addressed the scope of an official's burden to establish that a suit against him is based on actions taken within his authority, but Davenport is wrong to suggest that Supreme Court precedent offers no support for such a requirement. On the contrary, the Court has explained that "[t]he conception animating the qualified immunity doctrine . . . is that '*where an official's duties legitimately require action* in which clearly established rights are not implicated, the public interest may be better served by action taken with independence and without fear of consequences.'" *Mitchell*, 472 U.S. at 525 (emphasis added) (some internal quotation marks omitted) (quoting *Harlow*, 457 U.S. at 819); *see also Harlow*, 457 U.S. at 819 (emphasizing that qualified immunity "provide[s] no license to lawless conduct"). And recent precedent reiterates that "[g]overnment officials are entitled to qualified immunity with respect to '*discretionary functions*' *performed in their official capacities*."

16

*Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017) (emphasis added) (quoting

*Anderson v. Creighton*, 483 U.S. 635, 638 (1987)).

We acknowledge that not every circuit court has formulated the

discretionary-authority requirement as part of its qualified-immunity analysis, *see,*

*e.g.*, *Stanley v. Gallegos*, 852 F.3d 1210, 1214–16 (10th Cir. 2017) (opinion of

Hartz, J.) (collecting cases and discussing pros and cons of the requirement); *id.* at

1225–27 (Holmes, J., concurring in the judgment) (arguing that Tenth Circuit

precedent forecloses the requirement), and we acknowledge that not all of those

that have formulated it apply it in precisely the same way as this Court, *see In re*

*Allen*, 119 F.3d 1129, 1132 (4th Cir. 1997) (Motz, J., concurring in the denial of

rehearing en banc). But these ambiguities, however potentially fascinating to legal

scholars, are of no help to Davenport in this appeal.

As Davenport concedes, we are bound by "ubiquitous" circuit precedent to

apply the discretionary-authority requirement. And we are bound to hold, based on

the comprehensive Alabama law that governs end-of-life decisions, that Davenport

acted beyond the scope of his discretionary authority when he allegedly instructed

the University Hospital to enter a do-not-resuscitate order for Cummings and to

remove him from artificial life support. We affirm the denial of qualified

immunity.

17

## B. We Lack Jurisdiction to Consider Whether the Amended Complaint States a Claim.

Davenport also contends that we should reverse because the amended complaint fails to state a claim, but we lack jurisdiction to do so. Although Davenport is right that "[s]tating a constitutional claim is a precondition . . . to defeat[ing] the qualified immunity defense," this correct statement of law presupposes a defendant who, unlike Davenport, has satisfied his burden. "To establish the defense of qualified immunity, the burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred . . . within the scope of his discretionary authority," and "only if[] the defendant does that will the burden shift to the plaintiff." *Harbert Int'l*, 157 F.3d at 1281; *see also Rich*, 841 F.2d at 1563–64 (explaining the "two-step framework" of our qualified-immunity analysis). Davenport failed to satisfy his threshold burden, so there is no defense for the estate to "defeat," and the district court did not err when it denied qualified immunity. This holding exhausts our jurisdiction under the collateral-order doctrine.

We can review the district court's "pretrial order[] denying qualified immunity" only because an official's potential immunity from suit "is both important and completely separate from the merits of the action," is "conclusively determine[d]" by an adverse order, and is "irretrievably lost" by the time it could be "reviewed on appeal from a[n adverse] judgment." *Plumhoff*, 134 S. Ct. at 2019.

18

We have concluded that the district court did not err when it "determine[d]" that Davenport failed to establish the defense of qualified immunity, so he has not "irretrievably lost" anything to which he was entitled. As a result, for us to consider whether the amended complaint states a claim would be an inappropriate adventure into "the merits of the action," which are "completely separate" from this interlocutory appeal. Davenport's argument that the district court erred when it ruled that the amended complaint states a claim must await adjudication on appeal from a final judgment.

## IV. CONCLUSION

We **AFFIRM** the order denying Davenport qualified immunity.