A09A0952. SANTIBANEZ v. THE STATE.
(686 SE2d 884)

PHIPPS, Judge.

A jury found Pedro Arroyo Santibanez guilty of trafficking in methamphetamine, possession of cocaine with intent to distribute, conspiracy to possess methamphetamine with intent to distribute, and conspiracy to possess cocaine with intent to distribute. On appeal, Santibanez challenges the denial of his motion to suppress the drug evidence, the sufficiency of the evidence underlying his conviction for trafficking in methamphetamine, the admission of hearsay evidence, the propriety of certain remarks made by the prosecutor during the state's closing argument, and the rejection of his claim of ineffective assistance of trial counsel. Because Santibanez has shown no reversible error, we affirm the judgment of conviction.

In connection with an ongoing investigation of suspected drug dealings by Santibanez, an investigation warrant was issued on January 20, 2005, which allowed, among other things, police surveillance of certain conversations occurring on three telephone accounts being used by Santibanez: the land line at his Gwinnett County residential apartment and two cellular phone accounts. The lead investigator (hereinafter, Investigator) on the case was an officer with the Gwinnett County Police Department who was then working as an undercover narcotics agent. These wire taps — as the Investigator referred to the telephonic surveillance — began the day after the warrant was issued, and quickly led to the issuance of additional investigation warrants.

The Investigator testified that the wire taps continued until February 8, and that during those 18 days, approximately 2,000

phone calls took place on the monitored accounts. Of those calls, an estimated 300 were pertinent to the drug investigation. Through the wire taps, coupled with visual, covert surveillance of the outside of Santibanez's apartment, the drug task force team was able to discern two of Santibanez's suppliers, several individuals who worked for Santibanez in various capacities, and numerous customers of Santibanez.

The Investigator recounted that, after hearing "so many phone calls about what we believed to be dope, decisions were made to begin to act on them." Accordingly, after hearing by wire tap certain customers plan to arrive at Santibanez's apartment to purchase drugs, undercover officers of the drug task force team outside the residence would observe the anticipated customers go into the apartment, exit after just a short period, and drive away in their vehicles. Then, the drug task force team — sometimes with the assistance of law enforcement in neighboring jurisdictions — would "have uniform do . . . traffic stop[s]." Several of these stops, the Investigator testified, had yielded drugs of the types and quantities that had been agreed upon during the preceding, monitored phone calls. Meanwhile, by about February 2, the Investigator had begun working on obtaining warrants to search numerous locations identified during the investigation. The drug task force team was planning to execute such a warrant upon Santibanez's residence during the week of February 8.

But on February 8, the Investigator recalled, Santibanez received a telephone call from one of his customers who had been stopped during a "pullover" in connection with the drug investigation. The Investigator was monitoring their conversation and heard the customer brief Santibanez on what had happened to him when he left Santibanez's apartment two days earlier. The Investigator testified that the customer told Santibanez that a vehicle had followed him from Santibanez's residential community to Forsyth; that once there, three patrol vehicles pulled him over; and that the officers who stopped him asked specifically whether he had been "down seeing the Mexicans." Santibanez had once lived in Mexico, and the Investigator recalled that during the telephone conversation, Santibanez became agitated and panicky; he asked his customer about the "cookies" — which, the Investigator interpreted, was street parlance for cocaine, especially crack cocaine; Santibanez also expressed worry that he was being watched; his customer warned Santibanez to consider "getting out"; and Santibanez ultimately agreed that he needed to "be moving."

Right away, the Investigator notified the surveillance team outside Santibanez's residence about the conversation. The team observed about five individuals rush out of Santibanez's apartment

and into three vehicles. As the vehicles attempted to exit the apartment complex, two of them were stopped by law enforcement; the third made a U-turn, and its driver ran back into Santibanez's apartment. Concerned that drug evidence inside Santibanez's residence would immediately be destroyed, police officers entered and secured the premises. They arrested Santibanez; his sister, Nereida (who was later co-indicted with Santibanez on several drug charges); and the individual who had run back into Santibanez's apartment (and who also was later co-indicted with Santibanez on several drug charges). That individual was found in the bathroom, pouring suspected contraband down the toilet.

After a search warrant issued, the officers began a search of Santibanez's two-bedroom, one-bathroom apartment. Among other items, the search yielded: suspected methamphetamine recovered from the toilet; suspected methamphetamine scraped from a ring that had formed around the wet bathtub; suspected methamphetamine recovered from a bedroom; suspected cocaine recovered from a bedroom;[1] digital scales of the type commonly used in illegal drug sales; numerous car tags, which, during the surveillance, had been seen interchangeably on several vehicles that had been driven to and then parked outside Santibanez's apartment; a bulletproof vest with "POLICE" written on it; a handgun; a shotgun; and collections of various electronics, such as laptops, camcorders, DVD players, and numerous cell phones. According to the Investigator, these electronics were not stored as if for personal use, but were collected into piles throughout the rooms of the apartment. The Investigator estimated that the value of these electronics was at least $20,000. Also, Santibanez had on his person more than $1,000, and there was approximately $2,000 in cash inside the apartment.

1. Santibanez contends that the trial court erred by denying his motion to suppress the drug evidence as fruit of the poisonous tree. He argues that the initial investigation warrant was not supported by probable cause and that therefore neither it nor the subsequent warrants should have issued.

At the hearing on the suppression motion, the Investigator testified that he had appeared before a superior court judge and sworn to the facts set forth in an affidavit presented for the issuance of the investigation warrant.[2] Among other facts, the affidavit set forth that the Investigator had obtained information from three confidential informants (CIs) during October 2004 through mid-

---

[1] The state showed that this substance weighed 7.14 grams and tested positive for cocaine.

[2] See OCGA § 16-11-64.

January 2005.

In October 2004, the Investigator received information from an agent of Hall County's drug enforcement unit who had arrested an individual for methamphetamine possession. That individual, CI-1, had claimed to have obtained the several ounces of methamphetamine from a Hispanic male known as "Pedro," who lived near a specified mall in Buford. Additional information from CI-1 led the Investigator to a certain apartment complex.

The affidavit set out that, also in October 2004, the Investigator was provided information from a different confidential informant, CI-2, who named "Pedro Santibanez" as the distributor of large amounts of methamphetamine, cocaine, and marijuana in the Buford area. CI-2 additionally provided the Investigator with the apartment number of Santibanez's residence within the apartment complex. CI-2 told the Investigator that Santibanez had a sister named Nereida Santibanez, who lived with him in the identified apartment unit, and a brother named Artemio. Independently, the Investigator discovered that the electricity account for the apartment was in the name of "Nereida Santivalles" and believed this actually referred to Santibanez's sister. The Investigator further discovered that the electricity account referenced "Artemio Santivalles"; that a telephone number associated with the electricity account was registered to "Artemio Santivanez"; and that a vehicle regularly parked in front of the target apartment unit was registered to "Artemio Santibanez." The Investigator believed that these names all referred to Santibanez's brother.

CI-2 further told the Investigator that he or she had been inside Santibanez's apartment and had seen large amounts of methamphetamine and cash; that Santibanez was using two cell phones and his residential land line to conduct his drug business, and that Santibanez sometimes used other individuals to deliver drugs for him. One such runner was Amanda Maddox, known as "Mandy." In November 2004, CI-2 reported to the Investigator that Santibanez had received a 20-pound delivery of methamphetamine within the past few days.

The affidavit set forth that, in December 2004, the Investigator met with a third confidential informant, CI-3, who was in custody after being arrested in possession of four ounces of methamphetamine and $3,500. CI-3 claimed to have purchased the drug from Pedro Santibanez and that Santibanez was a distributor of large amounts of methamphetamine in several counties, including Gwinnett. CI-3 claimed to have seen pounds of methamphetamine in Santibanez's apartment. Although CI-3 did not know the street address, CI-3 gave detailed directions leading directly to Santibanez's apartment. CI-3 further told that Santibanez dealt also in

cocaine and marijuana and that he used a runner named "Mandy."

CI-3 claimed to have been purchasing approximately one-half pound of methamphetamine from Santibanez about every three days and was due to call in an order. While with the Investigator, CI-3 placed a telephone call, which was recorded. A male answered, confirmed he was "Pedro," then agreed to provide CI-3 with another half pound of methamphetamine, plus an ounce of cocaine. CI-3 explained to the Investigator that the normal practice would be for CI-3 to then go to Santibanez's apartment and pick up the drugs. CI-3 gave the Investigator two cell phone numbers that CI-3 claimed were being used by Santibanez to conduct his drug business.

The affidavit set forth that in late December 2004, about two weeks after the recorded phone call, CI-2 contacted the Investigator and reported that Santibanez had recently called "Mandy" to deliver methamphetamine for him. CI-2 told the Investigator that Santibanez had called from two different phones, and CI-2 gave the Investigator both numbers. The Investigator noted that these two numbers were the same two numbers supplied him by CI-3, one of which CI-3 had used to contact Santibanez for the recorded call. In mid-January 2005, the Investigator met with CI-2, who reported that on the day before, Mandy had received a "drug related" phone call from Santibanez. After the call, CI-2 noted from Mandy's phone the telephone number of Santibanez's incoming call. CI-2 provided that number to the Investigator, who realized that it was one of the cell phone numbers provided him by CI-3.

The affidavit stated that the three CIs were unrelated persons, who did not know one another and had not at any time been involved with one another in any of the events related to the pending investigation.

Challenging on appeal the finding of probable cause,[3] Santibanez points out that the affidavit described CI-1 and CI-2 as "untested CI[s] with Law Enforcement"; that the affidavit provided no details of how CI-2 came to the Investigator's attention; and that the affidavit did not specify the date when CI-2 had seen drugs and large sums of money in Santibanez's apartment. Santibanez further

---

[3] See OCGA § 16-11-64 (c) (allowing superior court to issue an investigation warrant permitting the use of devices, defined in OCGA § 16-11-60, for the surveillance of persons or places to the extent the same is consistent with and subject to the terms, conditions, and procedures provided for by Chapter 119 of Title 18 of the USCA, as amended); 18 USCS §§ 2516 (providing that a state statute may authorize an electronic surveillance order), 2518 (3) (requiring, among other things, probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense; and probable cause for belief that particular communications concerning that offense will be obtained through such interception); see also *State v. Palmer*, 285 Ga. 75, 77 (673 SE2d 237) (2009) (a search warrant will issue only upon facts sufficient to show probable cause).

points out that the affidavit did not reveal why CI-3 was under arrest nor state how long CI-3 had been in custody. Santibanez also asserts that the affidavit failed to outline the criminal histories of the three CIs and failed to predict any future behavior.

In determining whether probable cause exists,

> [t]he task of the issuing [court] is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [it], including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.[4]

The duty of the appellate courts is to determine whether the court that issued the warrant had a "substantial basis" for concluding that probable cause existed.[5] Moreover, "doubtful cases should be resolved in favor of upholding a . . . determination that a warrant [was] proper."[6]

> In reviewing the trial court's grant or denial of a motion to suppress, we apply the well-established principles that the trial court's findings as to disputed facts will be upheld unless clearly erroneous and the trial court's application of the law to undisputed facts is subject to de novo review, keeping in mind that a . . . decision to issue a search warrant based on a finding of probable cause is entitled to substantial deference by a reviewing court.[7]

According substantial deference to the finding of probable cause by the issuing court, we find no error in the denial of the suppression motion. Although Santibanez takes issue with various aspects of the affidavit, we find that the totality of the circumstances, including the CIs' collective reports and the Investigator's independent corroboration, authorized the finding that probable cause existed to issue the initial investigation warrant.[8]

2. Santibanez contends that the evidence was insufficient to

---

[4] *Illinois v. Gates*, 462 U. S. 213, 238 (III) (103 SC 2317, 76 LE2d 527) (1983); see *Palmer*, supra.

[5] *Palmer*, supra.

[6] Id. at 79 (citation and punctuation omitted).

[7] Id. at 78.

[8] See id. at 79 (reiterating that an informant's "veracity," "reliability," and "basis of knowledge" are neither independently dispositive nor irrelevant, but instead are several of a number of relevant factors).

support his conviction for trafficking in methamphetamine. When an appellant challenges the sufficiency of the evidence to support his conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[9]

The indictment alleged that Santibanez had been in possession of "200 grams or more of a mixture containing methamphetamine."[10] Santibanez acknowledges that the state showed that a state crime lab chemist had analyzed the substance recovered from the toilet and determined that it tested positive for methamphetamine and weighed 233 grams. Nevertheless, Santibanez argues that the state did not prove him guilty beyond a reasonable doubt because the chemist conceded on cross-examination that the substance analyzed and the evidence bag in which it had arrived at the state crime lab were wet. Santibanez relies upon this segment of the chemist's testimony, which the defense elicited on cross-examination.

Q: If you add water to it, will the substance itself absorb the water and make the possible weight of that heavier? Do you understand my question?

A: Yes, it can.

Q: It can?

A: It can make it heavier but it's — yes, it can.

Given this testimony, Santibanez asserts, "The water on and in the bag that contained the substance very well could have accounted for 34 or more grams. Thus, no rational trier of fact could have found, beyond a reasonable doubt, that the weight of the substances was in excess of 200 grams."

Santibanez disregards other testimony given by this chemist. When asked on direct examination whether there was "anything

---

[9] *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SC 2781, 61 LE2d 560) (1979) (emphasis omitted).

[10] While methamphetamine trafficking is committed, among other ways, by knowingly being in possession of "28 grams or more" of "any mixture containing . . . methamphetamine," OCGA § 16-13-31 (e), whether the defendant was in possession of "200 grams or more" is pertinent for sentencing. Compare OCGA § 16-13-31 (e) (1) (If such mixture is "28 grams or more, but less than 200 grams, the person shall be sentenced to a mandatory minimum term of imprisonment of ten years and shall pay a fine of $200,000.00.") with OCGA § 16-13-31 (e) (2) (If such mixture is "200 grams or more, but less than 400 grams, the person shall be sentenced to a mandatory minimum term of imprisonment of 15 years and shall pay a fine of $300,000.00."). With respect to his conviction for methamphetamine trafficking, Santibanez was sentenced to thirty years, to serve twenty in prison and ten on probation; he was fined $300,000.

about the physical look of the substance that seemed unusual," the chemist responded that "it's wet inside of here," specifying further, "[i]nside the bag, yeah, it's on the wet side and I wouldn't say that that's necessarily unusual but." Also, on cross-examination, the chemist testified that methamphetamine does not melt and that while "it can be wet[,] I wouldn't say that it retains water." And when defense counsel asked whether "the white chunky substance" was wet, the chemist described, "It was wet in nature. I mean, it was in the bag which was also wet." And when defense counsel followed up with, "[W]hen you weighed it, the weight of 233 grams, is that just the substance or is that the substance retaining water? That's my real question." The chemist answered, "The 233 grams is the weight of the solid material inside of that bag."

Santibanez also disregards that, in addition to the contraband recovered from the toilet, the state showed that suspected methamphetamine was found in a bedroom of his apartment. The state crime lab chemist who analyzed that substance testified that it tested positive for methamphetamine and that it weighed 29.60 grams. Viewed in the light most favorable to the prosecution, the evidence was sufficient for the jury to find beyond a reasonable doubt that Santibanez was in possession of "200 grams or more of a mixture containing methamphetamine."[11] "There is no requirement that a specific quantity of methamphetamine be present in the mixture to constitute a violation of the statute" proscribing methamphetamine trafficking.[12] That statute "treats pure methamphetamine and a mixture containing methamphetamine equally."[13]

3. Santibanez contends that the trial court erred by allowing the Investigator to present hearsay. Santibanez cites the Investigator's explanation for the seizure of the piles of electronics from the apartment: "We had information through some of the phone calls that Pedro, in fact, would take drugs for electronic — electronic

---

[11] See *Yarbrough v. State*, 264 Ga. App. 848, 849 (1) (592 SE2d 681) (2003) (sustaining conviction for methamphetamine trafficking, where suspected substances tested positive for methamphetamine; substances contained traces of the vitamin B supplement, which drug dealers often add to methamphetamine, thereby reducing the purity of their drug product but increasing the amount of product for sale; and the total weight of the methamphetamine mixtures was 218 grams); cf. *Hill v. State*, 253 Ga. App. 658, 662 (2) (560 SE2d 88) (2002) (evidence was insufficient to show that defendant possessed 28 grams or more of a mixture of methamphetamine with intent to distribute, as such was the amount stated in defendant's indictment to support conviction for methamphetamine trafficking, where defendant did not possess that mixture sent to the lab for testing but rather only possessed the component parts of that mixture, police officer combined the components found in jars to create the mixture, and when officer combined the components, it became impossible to determine whether defendant had possessed 28 grams of methamphetamine or even a 28-gram mixture containing methamphetamine).

[12] *Hill*, supra at 661 (citation omitted).

[13] *Bellamy v. State*, 243 Ga. App. 575, 579 (2) (530 SE2d 243) (2000).

items." In addition, Santibanez cites the Investigator's testimony that "information we had" included that Santibanez would collect guns and trade them to one of his drug suppliers if he did not have cash.

We find no reversible error, given the strength of the prosecution's case. The state's evidence included audio recordings of drug deals being discussed, testimony by Santibanez's former customers regarding their purchases of drugs from him, and the drug evidence seized from Santibanez's apartment. And although Santibanez complains about the Investigator's testimony, one of Santibanez's former customers testified that she sometimes had traded electronics to Santibanez for drugs. And another of Santibanez's former customers testified that he had witnessed Santibanez trade guns to that particular supplier in exchange for drugs. In view of the foregoing, we conclude that any error in allowing the challenged testimony was harmless beyond a reasonable doubt.[14]

4. Santibanez complains that the prosecutor made improper remarks during closing argument. But as Santibanez concedes, no objection was made. The failure to object to the state's closing argument waived Santibanez's right to rely on the alleged improprieties as a basis for reversible trial court error.[15]

5. Santibanez contends that the trial court erred by rejecting his claim of ineffective assistance of counsel. To prevail on this claim, Santibanez was required to show the trial court both that his counsel's performance was deficient and that the deficiency prejudiced his defense.[16] Both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact.[17] In reviewing a trial court's determination regarding a claim of ineffective assistance of counsel, this court upholds the trial court's factual findings unless they are clearly erroneous; we review the trial court's legal conclusions de novo.[18]

(a) Santibanez argues that his trial counsel performed deficiently by failing to seek a directed verdict on the methamphetamine trafficking charge. Because a motion for a directed verdict would

---

[14] See *Wiggins v. State*, 280 Ga. 627, 630 (2) (b) (632 SE2d 80) (2006) (admission of hearsay is harmless when it is cumulative of admissible evidence showing the same fact); *Felder v. State*, 270 Ga. 641, 646 (8) (514 SE2d 416) (1999) (where it is highly probable that cumulative and immaterial hearsay did not contribute to the guilty verdict, a reversal of the conviction is not necessary).

[15] See *Sampson v. State*, 282 Ga. 82, 83 (3) (646 SE2d 60) (2007).

[16] *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984); *Suggs v. State*, 272 Ga. 85, 87 (4) (526 SE2d 347) (2000).

[17] *Suggs*, supra at 88 (4).

[18] Id.

have been futile, there is no merit in this argument.[19]

(b) Santibanez argues that his trial counsel performed deficiently by failing to object to allegedly improper remarks during the state's closing argument.

(i) Santibanez complains that the prosecutor told the jurors that they should be angered by the actions of Santibanez and his associates for bringing into the county a methamphetamine business and all of the negative consequences of such a drug trade. Santibanez also asserts that the prosecutor inflamed the jurors by alluding to him as "people like him" whom the state argued represented "a lot of what's wrong with what's going on in this country and in your county" and characterizing him as a "threat to everybody that lives in this county." According to Santibanez, these remarks were made to "mine anti-immigrant prejudice" and were further impermissible as arguing his future dangerousness.

"[A] prosecutor generally may appeal to the jury to convict for the safety of the community. That is what occurred in this case. Read in context, the prosecutor's statements urge[d] the jury to convict to rid society of the dangers imposed by drug use."[20] Therefore, the lack of an objection based upon the cited remarks, when considered in context, was not deficient performance.[21]

(ii) Santibanez asserts that the following remarks by the prosecutors argued facts not in evidence:

[Defense counsel] knows there are hundreds and hundreds of phone calls involving all these people. And [defense counsel] has sort of made a disingenuous argument here to try and imply to you that only because I chose to bring in four or five phone calls, say, involving Michael Smith [who testified that he had been one of Santibanez's methamphetamine customers and who was later co-indicted with Santibanez on drug charges], that somehow that's just a skimpy piece of evidence involving Michael Smith and Pedro Santibanez. [Defense counsel] knows that's just not the case.

---

[19] See Division 2, supra; *Middlebrooks v. State*, 289 Ga. App. 91, 94 (3) (a) (656 SE2d 224) (2008) (failure to file a futile motion does not amount to deficient performance).

[20] *Shaw v. State*, 265 Ga. App. 451, 454 (4) (594 SE2d 393) (2004) (citations and footnotes omitted); see *Davis v. State*, 266 Ga. 801, 804 (8) (471 SE2d 191) (1996) (holding that it is not improper for a prosecutor to appeal to the jury to convict for the safety of the community and concluding that trial court did not err by denying mistrial motion based upon prosecutor's argument to jurors that they had a chance to do something about the crime problem in their city, state, and country); *Callahan v. State*, 179 Ga. App. 556, 564 (5) (347 SE2d 269) (1986) (noting that a prosecutor's comment to jurors that they could take part in the war against drug trafficking by convicting the defendant was not an improper appeal).

[21] *Middlebrooks*, supra.

This case could — this trial could last three weeks if I wanted it to. We could bring in every phone call, you know. You don't want that. Neither do I. And it's not necessary. We brought in enough phone calls to give you an idea, to give you a snapshot of 18 days in the life of that man sitting there and that's what you've heard.

Unquestionably, the law forbids the introduction, by way of argument, of facts not in the record and calculated to prejudice the accused.[22] However, "[b]oth the prosecution and the defense are permitted wide latitude in their closing arguments. As a general rule, closing argument is appropriate as long as it is based on evidence that is properly before the jury."[23] "Closing arguments are judged in the context in which they are made."[24]

We find no reversible error. Even if counsel had objected and sought a curative instruction, there is no reasonable probability that the outcome of Santibanez's trial would have been different.[25] And even had defense counsel further moved for a mistrial, there is no reasonable probability that one would have been granted.[26] The trial court did not err in rejecting Santibanez's motion for new trial based upon his claim of ineffective assistance of counsel.

*Judgment affirmed. Smith, P. J., and Bernes, J., concur.*

DECIDED NOVEMBER 18, 2009.

*Randall S. Estes*, for appellant.
*Daniel J. Porter, District Attorney, Rodney K. Miles, Assistant District Attorney*, for appellee.

---

[22] *Hildebrand v. State*, 209 Ga. App. 507, 509 (3) (a) (433 SE2d 443) (1993).

[23] *Smith v. State*, 284 Ga. 599, 602 (2) (a) (669 SE2d 98) (2008) (footnotes omitted).

[24] *Adams v. State*, 283 Ga. 298, 302 (3) (e) (658 SE2d 627) (2008).

[25] See *Lajara v. State*, 263 Ga. 438, 440-441 (3) (435 SE2d 600) (1993) (a court addressing the ineffective assistance issue is not required to approach the inquiry in any particular order or even to address both components if the defendant has made an insufficient showing on one).

[26] See *Adams*, supra at 303 (3) (f).