[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 20-11584
Non-Argument Calendar

————————————————

D.C. Docket No. 1:17-cv-00110-MLB

KEVIN A. ROSS,
KEVIN ROSS PUBLIC AFFAIRS, LLC,
THE LAW PRACTICE OF KEVIN A. ROSS, LLC,
KEVIN ROSS POLITICAL CONSULTING GROUP, LLC,

Plaintiffs - Appellants

versus

ROBERT JAMES,
Dekalb County District Attorney, in his Individual Capacity,
WILLIAM C. NIX,
in his individual capacity,

Defendants - Appellees,

————————————————

Appeal from the United States District Court
for the Northern District of Georgia

————————————————

(June 22, 2021)

Before JORDAN, JILL PRYOR and GRANT, Circuit Judges.

PER CURIAM:

This appeal requires us to decide whether former District Attorney for DeKalb County Robert James and Investigator William Clay Nix are entitled to qualified immunity from Kevin Ross's Fourth Amendment claims. Ross argues that James and Nix violated his Fourth Amendment rights by making material misstatements and omissions in their applications for authorization to wiretap Ross's phone and for a warrant to search his home and office. The district court granted summary judgment to James and Nix, concluding that, even after correcting for the alleged misrepresentations, the applications still would have established both actual and arguable probable cause to believe Ross was involved in unlawful bid rigging. Thus, the court reasoned, James and Nix were entitled to qualified immunity from Ross's suit. After careful review, we affirm.

## I.    BACKGROUND[1]

### A. The Wiretap Application

Kevin Ross is an attorney and political consultant who has managed several political campaigns, including Burrell Ellis's 2008 campaign for DeKalb County

---

[1] Because we write for the parties, we assume their familiarity with the record and set out only what is necessary to explain our decision. On review of a motion for summary judgment, we review the facts in the light most favorable to the plaintiff. *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002).

Chief Executive Office ("CEO").[2]  Robert James, then the District Attorney for

DeKalb County, Georgia,[3] applied for and obtained a wiretap authorization to

intercept and record Ross's telephone communications on the basis that there was

probable cause to believe that Ross; Ellis, then CEO for DeKalb County; and

others were committing 11 criminal offenses, including extortion, bribery, and

"[c]onspiracy in restraint of free and open competition in transactions with state or

political subdivision," i.e., bid rigging.  Doc. 111-1 at 3.[4]  The application included

an affidavit by William Nix, an investigator for the DeKalb County District

Attorney's Office ("DA's Office"), setting forth factual allegations supporting the

request for a wiretap.

Nix's affidavit stated that the DA's Office was investigating the DeKalb

County Department of Watershed Management for "invoice padding, contract

fraud[,] and bid rigging."  *Id.* at 12.  According to the affidavit, the investigation

revealed that Ellis was a participant in a scheme that involved cancelling contracts

for punitive and political reasons, soliciting campaign contributions under his title

as CEO, and making those solicitations with vendors that had a just-approved or

---

[2] Ross is the sole member of appellants The Law Practice of Kevin A. Ross, LLC; Kevin Ross Public Affairs, LLC; and Kevin Ross Political Consulting Group, LLC.  For ease, we refer to the appellants as "Ross" throughout this opinion.

[3] James was the District Attorney for DeKalb County from 2010 to 2016.

[4] "Doc." numbers refer to the district court's docket entries.

3

pending contract with DeKalb County.  The affidavit stated that the DA's Office was working with a confidential source in Ellis's administration who provided recordings of phone calls and meetings with Ellis, Ross, and others that shed light on the scheme.

The confidential source was later identified as Kelvin Walton, then DeKalb County's Director of the Department of Purchasing and Contracting and its Chief Procurement Officer.  After discovering that Walton had perjured himself before the grand jury, James offered him the opportunity to become a confidential source for the DA's Office.  Before the district court, Ross complained that Nix's affidavits supporting the wiretap of Ross's phone and search warrant of his house and office omitted the fact that during Walton's tenure as a confidential source, he failed three polygraph tests.  In a deposition taken in this case, Nix testified that he orally provided this information to the state court judge who signed the wiretap application, but the record contains conflicting evidence about whether he informed the judge who signed the search warrant.

Nix's affidavit implicated Ross in Ellis's scheme.  It cited an *Atlanta Journal-Constitution* article describing Ross as a "friend" and "advisor" to Ellis and stating that Ellis had cancelled three contracts since he took office; two cancellations benefited companies associated with Ross.  *Id.* at 16.  One of the two cancelled contracts was with a competitor of Ross's client.  Ross was quoted as

4

saying he recommended that Ellis terminate the contract, but Ellis said Ross had no influence on his decision. The other contract ultimately was awarded to Rural/Metro Ambulance, another of Ross's clients, after Ellis cancelled it with the initial vendor. The article noted that Ross denied involvement in the decision to cancel this latter contract.

The affidavit also stated that less than two months after the DA's Office initiated its investigation, it received a memorandum entitled "Things to Know" (the "Memorandum"), alleging that Ellis would refuse to sign contracts with vendors until they donated to his campaign and that Ross instructed a DeKalb County contractor to replace one of its subcontractors, Superior Pipeline, with a company of Ross's choosing. The affidavit noted that the Memorandum was corroborated by Dion Allen, the owner of Superior Pipeline, in an interview and in his testimony before the grand jury, but it failed to include that Allen testified before the grand jury that he didn't know who Ross was. The affidavit acknowledged that the Memorandum was written and delivered by individuals who were under investigation by the DA's Office, but it failed to disclose that its author invoked the Fifth Amendment when asked about it before the grand jury.

The affidavit summarized several recorded conversations between Walton (the confidential source) and members of Ellis's staff, including Ellis himself. One such conversation was with Ellis's Chief of Staff, Hakim Hilliard, who said that

5

Ross "should have been prosecuted and disbarred" due to a separate incident but instead "made a confidential deal." *Id.* at 32. Ross points out that Hilliard later said his remark was based on "rumors [he] had heard throughout the years and thought might be true," but he had "no personal knowledge of any illegal or criminal acts committed by []Ross related to his involvement with former Atlanta Mayor Campbell, and [he] had no personal knowledge of the existence of any agreement between []Ross and the federal government." Doc. 110-3 at 2. Additionally, Nix testified that he "didn't do anything to corroborate" Hilliard's remark. Doc. 122-1 at 37.

Most of the recorded conversations summarized in the affidavit, however, involved discussions about the bidding process for two DeKalb County contracts, the Emergency Management Services Contract ("EMS Contract") and the Consent Decree/Capital Improvement Program Management Contract ("PM Contract"). The affidavit detailed Ross's representation of two vendors who were actively competing for the EMS and PM Contracts.

### 1. The EMS Contract

With respect to the EMS Contract, Ross represented Rural/Metro Ambulance in connection with its bid. Rural/Metro's bid included objections (known as "exceptions") to various terms and conditions set forth in the County's request for proposal ("RFP"). DeKalb County then sent Rural/Metro a letter

6

stating that to be considered for the EMS Contract, the company had to withdraw its exceptions to the RFP.  Three weeks later, Ellis told Walton that there was a "need for exceptions to be made" to the EMS Contract but he was "getting resistance" from Fire Chief Eddie O'Brien, the chair of the contract selection committee.  Doc. 111-1 at 32.  A few days later, Ross asked Walton if he had spoken to Ellis about exceptions to the EMS Contract; Ross said he had made a "suggestion" to Ellis about exceptions to the contract and that Ellis was going to "run it by" Walton.  *Id.*  Ross also observed that the County Law Department was being "overly strict" with respect to the EMS Contract.  *Id.*

Ellis called Ross about a week later and told him that he had spoken to O'Brien about "the specific exceptions" related to the EMS Contract.  *Id.* at 33. Ellis and Ross discussed making the RFP "less rigid," and Ellis made suggestions about how Ross should handle the vendor interviews during the selection process. *Id.*  Walton informed Ellis that the evaluation process had already begun and that Rural/Metro would have to withdraw its exceptions to get an interview.  Ellis then told Ross that Rural/Metro should withdraw its exceptions; that same day, Rural/Metro did so.

About a month after Rural/Metro withdrew its exceptions, Ross called Walton to express concerns about the EMS Contract.  Ross said that Rural/Metro had received a letter stating that there would be no post-award negotiations with

the County on the terms of the Contract, but it was expecting a letter that would allow for such negotiations. Walton explained that Ellis wanted to allow Rural/Metro to negotiate the terms post-award, but that the County Law Department was opposed to it. Ross said he was also concerned that a committee member reviewing the EMS Contract bids had given Rural/Metro low scores in the past. Walton assured Ross that the member he was worried about was not leading the committee. Ross then asked who from Ellis's office and from Walton's department was assigned to the committee; Walton gave Ross the names of the two committee members.

### 2. The PM Contract

As to the PM Contract, Ross represented Montgomery Watson in connection with its bid. Ellis asked Walton to place Joel Alvarado on the PM Contract's selection committee, noting that he and Alvarado had previously met with Ross. A few months later, Ross called Walton to discuss the PM Contract selection process. Ross said he knew the selection committee had ranked the proposed vendors and that Montgomery Watson was ranked first and another company, CDM Smith ("CDM"), was ranked second. Montgomery Watson was apparently ahead of CDM by seven points, but Ross was concerned because Montgomery Watson's proposed cost was much higher than CDM's. Ross then asked Walton how to "handle that situation,"—presumably whether the selection committee

8

would still award Montgomery Watson the contract even though its proposed cost was higher than CDM's—and whether post-award negotiations were permitted. Doc. 111-1 at 35. The affidavit observed that the PM Contract selection committee had not publicly announced vendor rankings, so the only way for Ross to have had such specific information about the rankings was if someone from the committee had shared confidential information.

Two days after this conversation between Ross and Walton, the DA's Office applied for and received authorization to wiretap Ross's phone. The application was supported by the Nix affidavit.

## B. The Search Warrant Application

About a month after the DA's Office received the wiretap authorization, it applied for and obtained a search warrant for Ross's home and office. The application included a supporting affidavit, also by Nix. The search warrant affidavit was largely identical to the wiretap affidavit, except it also included information obtained from the wiretap.

The affidavit included a summary of a conversation between Ross and a representative from Montgomery Watson regarding the PM Contract. The two discussed the difference in pricing between Montgomery Watson's bid and its competitors' bids. The Montgomery Watson representative noted that the evaluation committee was "supposed to meet Monday" and suggested drafting a

9

white paper to "sway them." Doc. 115-1 at 37. The affidavit noted that the information discussed in the call was supposed to be "kept secret" and confined to members of the committee. *Id.* at 38.

That same day, Ross called Walton to discuss the EMS and PM Contracts. As to the EMS Contract, after Walton told Ross that Ellis did not want to send a letter allowing Rural/Metro to negotiate terms with the County post-award, Ross said he would "talk to [] Ellis" because Ellis had "previously committed to sending the letter." *Id.* Ross also asked Walton who would be on the EMS Contract's selection committee. As to the PM Contract, Ross asked about "further developments" on the selection process. *Id.* Walton responded that he had information that conflicted with what Ross had previously told him about the rankings; Ross stated that "his source seemed to be 'pretty clear.'" *Id.* at 39.

Ten days later, Walton called the chairman of the PM Contract selection committee, Rudy Chen, to get an update on the status of the vendor selection. Chen stated that the committee had narrowed it down to two firms, CDM and DeKalb Water Partners, and that although Montgomery Watson had the highest score, its proposed price was too high. Chen also noted that Ken Saunders, who was placed on the selection committee by Ellis, "definitely wanted the committee to recommend Montgomery Watson and that [his] behavior bordered on being belligerent." *Id.* at 35. Chen expressed concern that Alvarado, another committee

10

member placed by Ellis, was "secretly recording the committee members" and noted that Alvarado received numerous phone calls during the evaluation process. *Id.* Chen told Walton that the committee ultimately recommended DeKalb Water Partners for the PM Contract by a four-to-three vote; Saunders and Alvarado were two of the three committee members who voted against DeKalb Water Partners. Before the district court, Ross noted that the affidavit failed to include that during this conversation, Chen and Walton discussed that Ellis did not know Saunders very well and that Chen said Alvarado ranked DeKalb Water Partners first and Montgomery Watson third.

Less than a week later, Ross called the Montgomery Watson representative to discuss "how to get around the [PM Contract] selection committee's recommendation without raising suspicion." *Id.* at 51. Ross stated that he would reach out to Walton to "help 'shape it,'" and the two agreed to continue the conversation later that week. *Id.*

The day after the search warrant on Ross's home and office was approved, Walton informed Ross that Rural/Metro had not been awarded the EMS Contract. The search warrant was executed three days later. Ultimately, the investigation resulted in no charges against Ross.

11

## C. Procedural History

Ross filed a complaint against James and Nix pursuant to 42 U.S.C. § 1983, alleging that they made material misstatements and omissions in their applications for the wiretap and search warrant, in violation of Ross's Fourth Amendment rights. Following discovery, the parties filed competing motions for summary judgment; the district court denied Ross's motion and granted James and Nix's, concluding that James and Nix were entitled to qualified immunity.[5] This is Ross's appeal.

## II.    STANDARD OF REVIEW

We review the district court's denial of summary judgment based on qualified immunity *de novo*, viewing the facts in the light most favorable to the nonmovant, here, Ross. *Hunter v. City of Leeds*, 941 F.3d 1265, 1274 n.8 (11th Cir. 2019). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.    DISCUSSION

Ross argues that James and Nix are not entitled to qualified immunity on his Fourth Amendment claims because they were not acting within their discretionary

---

[5] The district court also concluded that to the extent Ross asserted separate claims for attorneys' fees and punitive damages, James and Nix were also entitled to summary judgment on those claims as they were derivative of Ross's substantive § 1983 claims.

12

authority when they applied for the wiretap on his telephone and because the wiretap and search warrant applications contained material misrepresentations and omissions that, once corrected, would not have established probable cause. Thus, Ross contends, the district court erred in granting James and Nix summary judgment. We address Ross's arguments in turn and ultimately agree with the district court that James and Nix are entitled to qualified immunity.

**A. James and Nix are Entitled to Qualified Immunity.**

"Qualified immunity shields public officials from liability for civil damages when their conduct does not violate a constitutional right that was clearly established at the time of the challenged action." *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016). To receive qualified immunity from a § 1983 suit, the public official bears the initial burden of establishing that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks omitted). If he carries that burden, the burden shifts to the plaintiff to establish "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (internal quotation marks omitted).

13

### a. Discretionary Authority

A government official acts within his discretionary authority if his actions were undertaken pursuant to the performance of his duties and within the scope of his authority. *Mikko v. City of Atlanta, Ga.*, 857 F.3d 1136, 1144 (11th Cir. 2017). In making this inquiry, "[w]e ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex. rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). "In applying each prong of this test, we look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Id.* at 1266. That is, "a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, *the outer perimeter* of an official's discretionary duties." *Mikko*, 857 F.3d at 1144 (internal quotation marks omitted).

Ross argues that James and Nix were not acting within the scope of their discretionary authority when they applied for authorization to wiretap his phone and thus cannot be entitled to qualified immunity.[6] Ross points to the federal

---

[6] Ross does not dispute that James and Nix were acting within the scope of their discretionary authority when they applied for the search warrant for Ross's home and office.

wiretap statute, 8 U.S.C. § 2516(2), which Georgia has incorporated. *See* Ga. Code Ann. § 16-11-64(c); *State v. Harrell*, 744 S.E.2d 867, 869 (Ga. Ct. App. 2013) ("Georgia's substantive requirements for obtaining a wiretap incorporate the federal requirements."). The statute contains a finite list of enumerated offenses for which prosecutors may seek a wiretap, including extortion and bribery. *See* 18 U.S.C. § 2516(1). Ross contends that because the list does not include "a criminal offense of conspiring to restrain free and open competition in violation of Ga. Code Ann. § 16-10-22(b)," i.e., bid rigging—the only offense for which Ross was actually being investigated—James and Nix were not acting within their discretionary authority when they sought a wiretap on Ross's phone. Appellant's Br. at 21. We reject Ross's argument.

We agree with the district court that Ross casts the inquiry too narrowly. At this stage of the analysis, "we do not ask whether the defendants acted illegally, because framed that way, the inquiry is no more than an untenable tautology." *Carruth v. Bentley*, 942 F.3d 1047, 1055 (11th Cir. 2019) (alteration adopted) (internal quotation marks omitted). Instead, we consider a public official's actions "at the minimum level of generality necessary to remove the constitutional taint." *Holloman*, 370 F.3d at 1266. For example, in considering whether an act of excessive force fell within a police officer's duties, we do not ask whether police have the right to use *excessive* force or whether police are responsible for enforcing

15

the law or promoting the public interest; we ask whether police have the power to attempt to effectuate arrests. *See id.* Thus, the question here is not whether it was within James and Nix's authority to seek this supposedly unlawful wiretap, but whether seeking a wiretap in general was part of their job-related powers and responsibilities. *See, e.g.*, *id.* ("[I]n assessing whether a police officer may assert qualified immunity against a Fourth Amendment claim, we do not ask whether he has the right to engage in *unconstitutional* searches and seizures, but whether engaging in searches and seizures *in general* is part of his job-related [function].").
When we ask the proper question, the answer is yes.

We look to state law to determine the scope of a state official's discretionary authority. *Estate of Cummings v. Davenport*, 906 F.3d 934, 940 (11th Cir. 2018). Under Georgia law, seeking a wiretap is within the authority of "the district attorney having jurisdiction over prosecution of the crime under investigation or the Attorney General." Ga. Code Ann. § 16-11-64(c). A wiretap application must be supported by probable cause, typically in the form of an affidavit written by an investigator. *See Santibanez v. State*, 686 S.E.2d 884, 888 n.3, 889 (Ga. Ct. App. 2009). Here, James, then the District Attorney of DeKalb County, applied for a wiretap authorization to intercept Ross's calls as part of an investigation of suspected criminal activity occurring in DeKalb County. Attached to the application was an affidavit from Nix, an investigator with the DA's Office, setting

16

forth the factual allegations supporting the wiretap. Because James and Nix had authority to seek a wiretap and submit an affidavit in support of the wiretap application, they were acting within the scope of their discretionary authority when they applied for the wiretap at issue here.

Ross resists this conclusion, citing *Davenport* to argue that James and Nix were acting outside the scope of their discretionary authority because bid rigging, the only offense Ross contends they were investigating, is not an enumerated offense for which a wiretap may be sought. Ross's reliance on *Davenport* is misplaced. In *Davenport*, we held that a prison warden acted outside the scope of his discretionary authority when he entered a do-not-resuscitate order and decided to remove an injured prisoner from artificial life support. *Davenport*, 906 F.3d at 937. There, Alabama law established that the prison warden had no authority whatsoever to control a dying prisoner's end-of-life decision. *Id.* at 941 (citing Ala. Code § 22-8A-11). Here, by contrast, James and Nix plainly had the authority to apply for a wiretap.

Ross is mistaken that we must consider only whether James and Nix had the authority to seek a wiretap for bid rigging, an unenumerated offense, because bribery and extortion, enumerated offenses, were "falsely included in the wiretap application." Appellant's Br. at 23. As discussed above, when conducting the discretionary authority inquiry, the first step in the qualified immunity analysis, we

17

"strip away . . . [the] allegedly unconstitutional action," *Davenport*, 906 F.3d at 942—here, that bribery and extortion were "falsely included" in the wiretap application, Appellant's Br. at 23.  *See Holloman*, 370 F.3d at 1266 ("[T]he inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act." (internal quotation marks omitted)).

James and Nix applied for a wiretap to intercept Ross's calls to investigate bribery and extortion, among other criminal offenses, and they had the authority under Georgia law to do so.  *See id.* at 1265 (explaining that in the discretionary authority inquiry we ask whether the government employee was performing a legitimate job-related function through means that were within his power to use).  As far as we can tell, Georgia law does not prohibit including enumerated and non-enumerated offenses in the same wiretap application.  We therefore conclude that James and Nix were acting within the scope of their discretionary authority when they applied for authorization to wiretap Ross's phone.

### b.  Constitutional Violation of Clearly Established Law

Because James and Nix were acting within their discretionary authority when they applied for the wiretap and search warrant, the burden now shifts to Ross to show that, taking the facts in the light most favorable to him, (1) James and Nix violated his constitutional right and (2) this right was clearly established at the

18

time of the alleged violation. *See Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008).

Ross argues that James and Nix violated his Fourth Amendment rights by making intentionally false statements in the affidavits supporting the wiretap and search warrant applications. The Fourth Amendment prohibits officers from making "statements or omissions in [a warrant] application that [are] material and perjurious or recklessly false." *Black v. Wigington*, 811 F.3d 1259, 1267 (11th Cir. 2016) (internal quotation marks omitted); *see Franks v. Delaware*, 438 U.S. 154, 164–65 (1978) ("[T]he Fourth Amendment demands a factual showing sufficient to comprise probable clause, the obvious assumption is that there will be a *truthful* showing . . . . [T]ruthful in the sense that the information put forth is believed or appropriately accepted by the affiant as true.") (internal quotation marks omitted)). Intentional or reckless misstatements or omissions in a warrant affidavit thus may violate the Fourth Amendment. *Paez v. Mulvey*, 915 F.3d 1276, 1287 (11th Cir. 2019). Negligent misstatements or omissions, on the other hand, do not. *Id.*

We employ a two-part test to determine whether a misstatement or omission in an officer's affidavit amounts to a Fourth Amendment violation. *Id.* "First, we ask whether there was an intentional or reckless misstatement or omission. Then, we examine the materiality of the information by inquiring whether probable cause would be negated if the offending statement was removed or the omitted

19

information included." *Id.* If the affidavits, including the omitted information, "would have demonstrated even arguable probable cause . . . then the officers are entitled to qualified immunity." *Id.* at 1288. Further, "arguable probable cause as to any one offense [listed in the application or affidavit] is sufficient." *Id.* at 1285 (citing *Madiwale v. Savaiko*, 117 F.3d 1321, 1327 (11th Cir. 1997) (concluding officer was entitled to qualified immunity when a misstatement and omission in a search warrant vitiated arguable probable case as to one offense but not others)).

### 1. The affidavits included intentional or reckless misrepresentations or omissions.

We begin by asking whether the affidavits included intentional or reckless misrepresentations or omissions. As an initial matter, we accept the district court's determination that, viewing the facts in light most favorable to Ross, the affidavits contained the following misrepresentations and omissions[7]: (1) both affidavits stated falsely that the Memorandum had been corroborated and failed to note that its author invoked the Fifth Amendment when asked about it; (2) both affidavits failed to disclose that Ellis's Chief of Staff's remark that Ross "should have been prosecuted and disbarred" due to a separate incident but instead "made a confidential deal" had not been verified; (3) the search warrant affidavit omitted that Walton failed three polygraph tests after he started working as a confidential

---

[7] No party challenges the district court's determination that the affidavit contained these misrepresentations and omissions.

source for the DA's Office; (4) both affidavits stated falsely that there was probable cause to believe Ross was involved in 11 offenses when James and Nix were really only investigating him for bid rigging; (5) the search warrant affidavit stated falsely that Alvarado voted against DeKalb Water Partners for the PM Contract and failed to disclose that Alvarado ranked Montgomery Watson, Ross's client, third; and (6) the search warrant affidavit failed to disclose that Chen, the chairman of the PM Contract evaluation committee, and Walton openly discussed that Ellis did not know Saunders very well.

Ross argues that the district court erred in concluding that three additional items were not misleading misrepresentations or omissions. We address each in turn.

First, Ross contends that the search warrant affidavit misleadingly omitted that vendors unaffiliated with Ross were ultimately recommended for the EMS and PM Contracts. As to the EMS Contract, Ross argues that due to the DA's Office's ongoing investigation and communication with Walton, it is reasonable to infer that James and Nix had "information in real time about the procurement of the EMS [C]ontract." Appellant's Br. at 30. Relatedly, Ross argues that it is reasonable to infer that James and Nix "planned" for Walton to inform him of the EMS Contract results the day after the search warrant was signed. *Id.* We reject these arguments; Ross presents no evidence that James and Nix knew about the

21

recommendation before seeking the search warrant and the inferences he asks us to draw are based on speculation.  Although we are required to draw all reasonable inferences in Ross's favor, "an inference based on speculation and conjecture is not reasonable."  *Avenue CLO Fund, Ltd. v. Bank of America, N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013) (internal quotation marks omitted).

With respect to the PM Contract, Ross's argument is contradicted by the record.  As Ross himself notes, the search warrant affidavit disclosed that the chairman of the PM Contract evaluation committee informed Walton that the committee recommended DeKalb Water Partners, not Ross's client, for the PM Contract.

Second, Ross argues that the affidavits falsely omitted that the DeKalb County procurement policies did not prohibit communications with County officials during the bidding process.  Ross asserts that the district court erred in focusing on whether the DA's Office believed such communications were impermissible.  But Ross is mistaken.  When assessing whether an affidavit contains a misstatement or omission, we ask whether the alleged misstatements or omissions "were made either intentionally or in reckless disregard for the truth," *United States v. Kirk*, 781 F.2d 1498, 1502 (11th Cir. 1986); thus, the affiant's belief as to the veracity the information put forth is squarely relevant, *see Franks*, 438 U.S. at 165–66 ("[T]he Fourth Amendment demands a factual showing

22

sufficient to comprise probable clause, the obvious assumption is that there will be a *truthful* showing . . . . [T]ruthful in the sense that the information put forth is believed or appropriately accepted by the affiant as true.") (internal quotation marks omitted)).  Here, the undisputed facts indicate that James, Nix, and others in the DA's Office believed Ross's communications with County officials during the bidding process were not permitted.  And Ross points to no record evidence suggesting that such communications were permissible.  Therefore, we conclude that Ross has failed to establish that the affidavits intentionally or recklessly omitted that Ross's communications were permitted by County policy.

Third, Ross asserts that the affidavits unnecessarily included information regarding Ellis's alleged corruption because it had "nothing to do with [Ross]" and thus that including the information was "materially misleading."  Appellant's Br. at 32.  This argument, too, is meritless.  Again, at this step we ask whether the alleged misrepresentations "were made either intentionally or in reckless disregard for the truth."  *Kirk*, 781 F.2d at 1502.  Ross presents no record evidence to suggest the information regarding Ellis was false.  Further, even if we agreed with Ross that the inclusion of this information was "misleading," he cites no authority in support of his argument that accurate, yet arguably potentially misleading, information must be stricken from a wiretap or search warrant affidavit.

23

## 2. The affidavits established arguable probable cause after correcting for the above misrepresentations and omissions.

After concluding that the affidavits included some misstatements and omissions, we now ask whether the affidavits, without those misrepresentations, would have established actual or arguable probable cause. *See Paez*, 915 F.3d at 1288. Probable cause to support an affidavit accompanying a search warrant application exists when it "establish[es] a connection between the [plaintiff] and the residence to be searched and a link between the residence and any criminal activity." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002). And "a wiretap must be supported by the same probable cause necessary to obtain a search warrant." *United States v. Goldstein*, 989 F.3d 1178, 1192 (11th Cir. 2021). Probable cause is "not a high bar." *United States v. Delgado*, 981 F.3d 889, 897 (11th Cir. 2020) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018)). It "does not require anything close to conclusive proof . . . or even a finding made by a preponderance of the evidence." *Paez*, 915 F.3d at 1286. "The mere probability or substantial chance of criminal activity is all that is needed." *Delgado*, 981 F.3d at 897 (internal quotation marks omitted).

Probable cause is a higher standard than arguable probable cause. *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004). Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the officials here *could*—not necessarily would—have

24

believed that probable cause existed. *Grider v. City of Auburn*, 618 F.3d 1240, 1257 (11th Cir. 2010). Put differently, to prevail Ross must demonstrate that "no reasonable officer could have found probable cause [in the affidavits] under the totality of the circumstances." *Kingsland v. City of Miami*, 382 F.3d 1228, 1232 (11th Cir. 2004); *see also Cozzi v. City of Birmingham*, 892 F.3d 1288, 1293–94 (11th Cir. 2018) ("[A]n officer who raises a qualified immunity defense will prevail if there was arguable probable cause."). This standard is objective "and does not include an inquiry into the [individual] officer's subjective intent or beliefs." *Grider*, 618 F.3d at 1257.

Whether probable cause or arguable probable cause exists depends on the elements of the alleged crime and the operative facts. *Gates v. Khokhar*, 884 F.3d 1290, 1298 (11th Cir. 2018). Viewing the facts here in the light most favorable to Ross, we agree with the district court that, even after correcting for the misrepresentations and omissions, the affidavits still established at least arguable probable cause to believe Ross was involved in bid rigging in violation of Ga. Code Ann. § 16-10-22(b).

The Georgia bid rigging statute prohibits "enter[ing] into a contract, combination, or conspiracy in restraint of trade or in restraint of free and open competition in any transaction with a political subdivision." Ga. Code Ann. § 16-10-22(b). The prohibition against "a conspiracy in restraint of trade or in restraint

25

of free and open competition" means "a prohibition against a conspiracy in unreasonable restraint of competition." *State v. Shepherd Const. Co., Inc.*, 281 S.E.2d 151, 154 (Ga. Ct. App. 1981) (internal quotation marks omitted). Under Georgia law, a conspiracy requires an agreement between two or more people to commit a crime and an overt act to effect the object of the conspiracy by at least one person in the conspiracy. *Griffin v. State*, 751 S.E.2d 773, 775 (Ga. 2013) (citing Ga. Code Ann. § 16-4-8). Such agreement need not be express—all that is required is a "tacit mutual understanding between persons to pursue a common criminal objective." *Id*. Additionally, a conspiracy may be proven by direct or circumstantial evidence, *see Baldivia v. State*, 599 S.E.2d 188, 192 (Ga. Ct. App. 2004), and may be "inferred from the nature of the acts done, the relation of the parties, the interest of the alleged conspirators and other circumstances," *Stokes v. State*, 845 S.E.2d 305, 311 (Ga. Ct. App. 2020).

The corrected affidavits contain evidence of at least arguable probable cause that Ross engaged in bid rigging in violation of Ga. Code Ann. § 16-10-22(b). The affidavits included evidence that Ellis and Ross were closely connected: Ross managed Ellis's CEO election campaign and, after Ellis was elected, Ross continued to act as his friend and advisor. The affidavits cited an *Atlanta Journal-Constitution* article that reported Ellis had cancelled three County contracts since taking office, and two of those cancellations benefited Ross's clients.

26

Additionally, the affidavits detailed several occasions when Ross explicitly sought information or benefits for his clients from DeKalb County officials in connection with the bidding process.  For instance, the affidavits stated that Ross successfully obtained information about the identity of members on the committees evaluating his clients' bids and the status of the confidential vendor selection process; he discussed the price difference between the bids of his client and a competitor when no such information had been publicly announced; he met with Ellis and Alvarado, a member of the PM Contract selection committee, before the contract was awarded; Ross and Ellis discussed making the EMS RFP "less rigid" and Ellis gave Ross suggestions for how to approach a vendor interview; Rural/Metro withdrew its exceptions to the EMS Contract the day Ellis told Ross that Rural/Metro should do so; and the search warrant affidavit noted that Ross and his client, Montgomery Watson, discussed "get[ting] around" the PM Contract selection committee's recommendation "without raising suspicion."

A reasonable officer could conclude that these multiple conversations between Ross, Ellis, and Walton, the confidential source, indicated a tacit agreement to influence the bidding process for the EMS and PM Contracts.  And Ellis made overt acts to further that goal by attempting to persuade the EMS Contract selection committee to permit exceptions sought by Ross's client and placing two members, Alvarado and Saunders, on the selection committee for the

27

PM Contract. This, among other information set out in the affidavits, could lead a reasonable officer to believe that Ross was engaged in a conspiracy to restrain free and open competition in violation of Ga. Code Ann. § 16-10-22(b). *See, e.g.*, *State v. Robins*, 674 S.E.2d 615, 616 (Ga. Ct. App. 2009) (recounting that defendant was indicted for violating Ga. Code Ann. § 16-10-22 because he shared competitors' bid information with companies in which he had an interest or were owned by friends and relatives); *see also* Ga. Code Ann. § 16-10-22(b) (the bid rigging offense is "complete when the contract, combination, or conspiracy is effected and an overt act in furtherance thereof has been committed.").[8]

We acknowledge that there is some evidence in the affidavits cutting the other way. The County ultimately did not allow exceptions to the EMS Contract sought by Ross's client. The chairman of the PM Contract selection committee noted that Ellis did not know Saunders very well and Alvarado ranked Ross's client third. And the search warrant affidavit noted that the PM Contract committee recommended DeKalb Water Partners, not Ross's client, for the Contract. But this evidence does not defeat arguable probable cause. Officers are

---

[8] We note the district court observed that even if it had concluded that the affidavits intentionally or recklessly misrepresented or omitted everything that Ross argued that they did, the court still would have held that the corrected affidavits established both actual and arguable probable cause. Likewise, our determination that the affidavits established at least arguable probable cause does not depend on the three items that Ross argues were misleading misrepresentations or omissions.

"not required to sift through conflicting evidence[,]" "resolve issues of credibility," or "resolve every inconsistency found in the evidence." *Paez*, 915 F.3d at 1286 (internal quotation marks omitted); *see also Wesby*, 138 S. Ct. at 588 ("[P]robable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts."). After considering all the evidence, the "totality of the circumstances" supports the conclusion that a reasonable officer could have believed Ross was engaged in bid rigging. *Kingsland*, 382 F.3d at 1232.

Ross argues that the corrected affidavits lacked arguable probable cause because they failed to establish "essential" elements of bid rigging, including that Ross knowingly joined a conspiracy.[9] Appellant's Br. at 37 (emphasis omitted). We remain unpersuaded. As detailed above, the affidavits contain sufficient evidence to establish arguable probable cause that Ross was engaged in a conspiracy to restrain free and open competition. Although the affidavits may not contain "specific evidence of each element of [bid rigging or a conspiracy] as would be needed to support a conviction," such evidence is not required to support

---

[9] Relatedly, Ross contends that the affidavits lacked arguable probable cause because Nix testified in his deposition that he had no evidence of Ross having been in an agreement or conspiracy with anyone to restrain competition for DeKalb County's contracts. Nix's testimony years after the challenged conduct does not impact our inquiry into whether the affidavits themselves, when viewed objectively, established arguable probable cause. *See Craig v. Singletary*, 127 F.3d 1030, 1042 (11th Cir. 1997) ("[E]ven though a police officer believed that probable cause was lacking, the Court still had the duty to objectively determine if probable cause was present." (internal quotation marks omitted)); *see also Grider*, 618 F.3d at 1257 ("The [arguable probable cause] standard is an objective one and does not include an inquiry into the officer's subjective intent or beliefs.").

a finding of probable cause, much less arguable probable cause. *Adams v. Williams*, 407 U.S. 143, 149 (1972); *see also Florida v. Harris*, 568 U.S. 237, 243–44 (2013) ("Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence . . . have no place in the probable-cause decision. All we have required is the kind of fair probability on which reasonable and prudent people, not legal technicians, act." (alterations adopted) (internal citations and quotation marks omitted)).[10]  Based on "an examination of all the operative facts," we conclude that a reasonable officer could have believed that Ross was engaged in bid rigging; thus, James and Nix are entitled to qualified immunity.[11] *Paez*, 915 F.3d at 1290.

---

[10] Because arguable probable cause does not require the same level or type of evidence as would be needed to support a conviction, Ross is mistaken that we should look to two Supreme Court decisions that overturned fraud and bribery convictions, respectively, for guidance on the question of whether the affidavits establish arguable probable cause of bid rigging. *See Kelly v. United States*, 140 S. Ct. 1565 (2020); *McDonnell v. United States*, 136 S. Ct. 2355 (2016).

[11] Ross's claim for attorney's fees and punitive damages requires that he obtain relief on his underlying 42 U.S.C. § 1983 claim. *See Estes v. Tuscaloosa County, Ala.*, 696 F.2d 898, 901 (11th Cir. 1983) ("Section 1988 authorizes attorney's fees as part of a remedy for violations of civil rights statutes; it does not create an independent right of action."); *Washington v. Kirksey*, 811 F.2d 561, 565 (11th Cir. 1987) ("Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (alterations adopted) (internal quotation marks omitted)).  Thus, because we conclude James and Nix are entitled to summary judgment based on qualified immunity as to Ross's § 1983 claim, Ross's claims for attorney's fees and punitive damages fail as a matter of law.

## IV.    CONCLUSION

For the foregoing reasons, we conclude that James and Nix are entitled to qualified immunity from Ross's § 1983 suit.  Thus, we affirm the district court's judgment.

**AFFIRMED.**